Memorandum Opinion by Chief Justice Valdez
This appeal arises from a judgment entered in favor of appellee Carduco, Inc.
*457 d/b/a Cardenas Metroplex (Carduco) and against appellants Mercedes-Benz USA, LLC; Jack L. Holt, a Mercedes Regional Franchise Manager; Craig W. Dearing, a Mercedes After-Sales Operations Manager; and Frank J. Oswald Jr., a Mercedes After-Sales Operations Manager, (collectively "MBUSA") in a suit for fraud in the inducement and negligent misrepresentation. By nine issues, MBUSA contend: (1-2) the reliance element of Carduco's claims was not established as a matter of law because (a) the alleged misrepresentations, whether oral representations or non-disclosures, conflicted with the terms of the parties' contract, and (b) Carduco contractually promised that it was not relying on any representations; (3) appellants did not owe a duty to disclose to Cardenas; (4) charge errors occurred; (5) the trial court abused its discretion by admitting evidence that MBUSA is indemnifying the individual defendants; (6) the trial court abused its discretion by refusing to require Carduco's counsel to fully open his jury argument; (7) cumulative error probably caused the rendition of an improper verdict; (8) no evidence, or at least factually insufficient evidence, supports the award of punitive damages; and (9) the punitive damages awards are excessive and unconstitutional.[1] We affirm as modified.
I. BACKGROUND
The facts giving rise to this case involves the following car dealerships and distributor: (1) Carduco, owned by Renato C. Cardenas, Sr. (Renato); (2) Autoplex Harlingen a/k/a Cardenas Autoplex, Inc. Harlingen (Autoplex), owned by Renato's son, Renato G. Cardenas (Rene), and later purchased by Carduco; (3) Heller-Bird Motors, owned by Ron Heller and Bill Bird; and (4) MBUSA, the North American distributor for Mercedes products, which is a wholly owned subsidiary of Daimler AG.
It is undisputed that from 1993 through 2009, Rene owned and operated a Mercedes-Benz dealership in Harlingen as part of Autoplex. It is also undisputed that in 2007 MBUSA encouraged Autoplex to relocate to McAllen, Texas, a location shown by MBUSA's studies to be the optimal location for customer convenience and for maximizing sales in the Rio Grande Valley. According to Renato, he personally knew that "the Mercedes people were there with Rene making plans to move it" because he was to do the construction on his son's new location in McAllen and had met with Rene and "Mercedes people" regarding the move. However, in the spring of 2008, MBUSA sent Rene a termination notice because, as Holt explained, Autoplex "was not meeting any [MBUSA's] performance *458 standards." Autoplex had also failed to file a required IRS form on the sale of a single car in 2005 and received a corporate felony conviction.
The termination proceedings were mooted in April 2008 when Carduco entered into an asset-purchase agreement with Rene for Autoplex. The purchase was conditioned on, among other things, Carduco receiving MBUSA's approval to become a franchised dealer. On May 8, 2008, Carduco applied to Mercedes-Benz for the Mercedes-Benz Harlingen franchise. According to Renato, he believed that MBUSA's approval of moving his franchise from Harlingen to McAllen was "a foregone conclusion." He based this understanding on the history MBUSA had with Rene, on Renato's own discussions and meetings with Dearing, and Oswald as the parties reviewed the selection of a location for Renato's new franchise in McAllen, and on MBUSA's alleged non-disclosure of certain information-that MBUSA was working to put another dealer in the McAllen area and had sent a final letter of intent to Heller-Bird Motors for the McAllen-area dealership.
On September 23, 2008, MBUSA's president and chief executive officer Ernst Lieb and General Manager Tracey Matura executed a binding letter of intent with Heller-Bird Motors to open a Mercedes-Benz dealership in San Juan, Texas. Lieb and Matura then approved Carduco's application to become a franchised Mercedes-Benz dealer in December 2008. On June 2, 2009, Carduco completed its purchase of Autoplex's assets. And on June 24, 2009, after Carduco received its state motor vehicle dealer license, Carduco and MBUSA executed the Mercedes-Benz Passenger Car Dealer Agreement that incorporated a number of other agreements (the Dealer Agreement).
In August 2009 Holt met with Carduco and other Texas Mercedes-Benz dealers to report that MBUSA was appointing Heller-Bird to a new dealership near McAllen. Within days of that meeting, Carduco formally requested a relocation of its Mercedes-Benz dealership to the McAllen area. In October, MBUSA rejected the request. In December 2010, Heller-Bird opened Mercedes-Benz of San Juan, and in March 2011, MBUSA informed Carduco that it was "implementing a realignment of certain zip codes," including the realignment of certain demographic areas of the Harlingen dealership's Area of Influence ("AOI") to Heller-Bird.
Carduco sued MBUSA, Holt, Oswald, and Dearing for fraud in the inducement and Oswald and Dearing for negligent misrepresentation.[2] Carduco alleged that MBUSA induced it to acquire Autoplex and a Mercedes-Benz franchise in Harlingen with the expectation of relocating and operating a Mercedes-Benz dealership in the McAllen area. Carduco claimed, among other things, that "Oswald and Dearing represented to Autoplex and Carduco that MBUSA had no plans to put another dealership in the McAllen, Texas sales area and that Carduco should submit plans to MBUSA to construct and operate an Autohaus facility in McAllen, Texas." After the trial court heard evidence that MBUSA had failed to preserve emails from potential witnesses after becoming aware of possible litigation in this case and had not instructed witnesses to preserve those emails after learning of Carduco's suit, the trial court granted Carduco's request *459 for a spoliation instruction in the jury charge.
The jury found Mercedes-Benz, Holt, Oswald, and Dearing liable for fraud in the inducement and found Dearing and Oswald liable for negligent misrepresentation. It awarded Carduco $15,307,722 in benefit-of-the-bargain damages and $6,085,195 in out-of-pocket damages. In addition, the jury found by clear and convincing evidence that the harm to Carduco resulted from fraud or malice. It then found beyond a reasonable doubt that each defendant engaged in conduct defined as the felony of securing execution of a document by deception. The jury assessed punitive damages of $100 million against MBUSA, $10 million against Holt, $2.5 million against Dearing, and $2.5 million against Oswald. The trial court rendered judgment on the verdict. This appeal ensued.
II. SUFFICIENCY OF THE EVIDENCE
By its first issue, relying on Playboy Enterprises, Inc. v. Editorial Caballero, S.A. de C.V., 202 S.W.3d 250, 258 (Tex.App.-Corpus Christi 2006, pet. denied), MBUSA challenges, as a matter of law, the reliance element of Carduco's fraudulent inducement and negligent misrepresentation claims, including any claim based on a non-disclosure theory. MBUSA direct this Court to the following terms of the Dealer Agreement that it assert directly conflict with Carduco's claims of misrepresentation and non-disclosure.
Dealer ... understands that its appointment as a Dealer (i) does not grant it an exclusive right to sell Mercedes-Benz Passenger Car Products in its Area of Influence [AOI] or any other geographic area ....
....
Unless otherwise provided in the Dealer AOI Space Analysis Addendum, MBUSA hereby approves the location(s) of the Dealership Facilities identified in the Final Paragraph for the exclusive purpose of: (i) showroom and sales facility for Mercedes-Benz Passenger Cars; (ii) service and parts facility for Mercedes-Benz Passenger Cars; (iii) facilities for display and sale of pre-owned Mercedes-Benz vehicles; and (iv) if applicable, other facilities for such other purpose(s) as may be identified in the Final Paragraph.... Dealer shall not move, relocate or change the designated usage of function of the Approved Location(s) or any of the Dealership Facilities without the prior written consent of MBUSA....
MBUSA has attempted to limit our analysis of the jury's finding of justifiable reliance on two alleged misrepresentations or non-disclosures.[3] Specifically, MBUSA argues that the jury found that it had either misrepresented only the following: (1) that Carduco had a right to relocate; and/or (2) that Carduco had the right of exclusivity in its AOI.[4] Therefore, according to MBUSA because the terms of the *460 Dealer Agreement directly contradict these findings, as a matter of law, the evidence is insufficient to support the jury's finding of justifiable reliance. For the reasons explained further below, we conclude that the jury's finding of fraud was not limited to only these two grounds.
In its jury charge, the trial court defined the term misrepresentation and stated that a non-disclosure could also form the basis of a fraud claim if all of the elements of fraud were proven. However, the jury was not instructed that it was limited to finding fraud only if it determined that MBUSA either (1) told Carduco that it could move to McAllen or (2) failed to tell Carduco that it would not be the exclusive dealership in its AOI. Instead, the jury was free to come to its own conclusion concerning what MBUSA misrepresented or failed to disclose to Carduco based on the evidence presented at trial. Therefore, if the jury found that MBUSA made other misrepresentations or non-disclosures that do not directly contradict the Dealer Agreement, then Playboy does not apply, and MBUSA could not meet its appellate burden of proving that, as a matter of law, Carduco could not have justifiably relied on the misrepresentations or non-disclosures.
And, as explained further below, another basis exists for the jury to have found that MBUSA misrepresented, failed to disclose, or actively concealed a material fact that did not directly contradict the Dealer Agreement's terms cited by MBUSA on appeal. In addition, even if MBUSA's misrepresentations and nondisclosures related to exclusivity or permission to move to McAllen, this case is wholly distinguishable from Playboy. See Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 179 (Tex.1997) (explaining that fraud vitiates a contract when the fraud constitutes "something more than merely oral representations that conflict with the terms of the written contract" and instead the fraud "prevents the coming into existence of any valid contract at all.").
A. Applicable Law
Causes of action for fraudulent inducement and negligent misrepresentation require proof of reliance. Miller Global Props., LLC v. Marriott Int'l, Inc., 418 S.W.3d 342, 347 (Tex.App.-Dallas 2013, pet. denied) (citing Haase v. Glazner, 62 S.W.3d 795, 798 (Tex.2001) ; Fed. Land Bank Ass'n of Tyler v. Sloane, 825 S.W.2d 439, 442 (Tex.1991) ). "[R]eliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law." Playboy Enterprises, Inc., 202 S.W.3d at 258 ; see DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A., 112 S.W.3d 854, 858 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (op. on reh'g) (en banc) (setting out that in order to negate justifiable reliance in this way, the extra-contractual misrepresentation must be "directly contradicted by the express, unambiguous terms of a written agreement between the parties"). We apply these principles to fraud claims based on alleged non-disclosures because reliance is also an element of fraud by non-disclosure or fraud by omission. See Horizon Shipbuilding, Inc. v. Blyn II Holding, LLC, 324 S.W.3d 840, 850 (Tex.App.-Houston [14th Dist.] 2010, no pet.) (listing the elements of fraud by non-disclosure or fraud by omission as: (1) the defendant failed to disclose facts to the plaintiff when the defendant had a duty to disclose such facts; (2) the facts were material; (3) the defendant knew of the facts; (4) the defendant knew that the plaintiff was ignorant of the facts and did not have an equal opportunity to discover the truth; (5) the defendant was deliberately silent and failed to disclose the facts with the *461 intent to induce the plaintiff to take some action; (6) the plaintiff relied on the omission ; and (7) the plaintiff suffered injury as a result) (emphasis added) ).
B. The Evidence
At trial, Holt, MBUSA's central regional manager, testified that prior to termination of Rene's Mercedes-Benz franchise, it had been MBUSA's desire that Rene move the dealership to McAllen due to a market analysis showing that the McAllen location would be optimal for Mercedes-Benz sales and that as far back as 2005, studies showed that the best strategy in the Rio Grande Valley would have been to relocate the Harlingen dealership to McAllen. Holt agreed that in 2005, the market study concluded that the Rio Grande Valley only required one dealership performing at the national average of sales and that the Mercedes-Benz brand had been performing above the average. Holt testified that in 2005, he believed that Rene was moving the dealership to McAllen and had asked Rene to "[o]btain a site location that is approved by" MBUSA. Holt stated that when MBUSA asked Rene to move to McAllen, Rene still had to formally get approval from MBUSA to move, but that the move would not have been denied because it was within the dealership's AOI. When asked by Carduco's trial counsel whether he had previously testified that "Autoplex had been approved to move to McAllen, but the specific site that they would have been permitted to move into still needed to be approved," Holt replied, "Yes. I will admit, I know where you're going there, and I wasn't accurate there. I was wrong. Was he preapproved in 2007 to relocate his store? Not without approval." Holt continued, "I was wrong, okay. I'm not denying that." During Holt's testimony, Carduco's trial counsel read portions of Holt's deposition into the record wherein Carduco's trial counsel asked, "The spot needed to be approved, not the concept of moving, right?" Holt responded, "You're right, we would have approved it."[5]
The jury heard evidence that upon hearing that Rene was selling the dealership, Holt was very excited and stated to a Mercedes-Benz employee, Fred Newcomb, "You made my day." However, when he discovered that Renato had agreed to buy Rene's dealership, Holt and Newcomb concluded that the sale was a "sham" and told others that MBUSA would "try to work around this" sale.[6] Newcomb told Holt, "the proposed purchaser appears to be [Rene's] father," and Holt replied, "So much for this buy/sell" and asked, "[l]s this legal? Can he sell it to his father to avoid this termination" and "Can we exercise right of first refusal in this case?" Holt then stated, "I think you agree we need to find a new dealer for this area." Holt did not specifically explain why he dreaded a sale of Autoplex by Rene to his father, Renato. However, Holt testified that, at the time, he believed that Renato and Rene were engaging in some sort of sham.
Subsequently, Newcomb sent an email to Holt stating, "Mark Kelly [one of MBUSA's in-house lawyers] has sent this buy/sell to Buddy Ferguson [an outside lawyer] to research if this sham buy/sell has to be honored." This occurred one day after the buy/sell agreement had been received by *462 MBUSA. Holt agreed that in this situation, he had determined that Rene's sale of the dealership was a sham. Newcomb also agreed that for a reason he could not recall, he had also concluded that the buy/sell was a sham. MBUSA's former employee, Damon Blakemore sent an email to Holt stating, "[Newcomb's] note mentioned the sale to Renato Cardenas, Sr. It sounds as if they're trying to keep it in the family or am I missing something?" Holt replied, "We will try to work around this. We still want to terminate or find a good partner."[7]
The jury heard evidence that despite a clause in their dealer agreement giving MBUSA the right of first refusal, under Texas law, MBUSA could not block Rene's sale of the dealership to Carduco and that because they had "the same last name," MBUSA considered Rene and Renato to be "one and the same" and considered the entire Cardenas family to be "all the same people." Holt stated, "There is no God" after discovering that the right of first refusal clause in the dealer agreement could not be enforced and that MBUSA could not prevent the sale of the dealership. Again, Holt did not explain his reaction to Rene's sale of Autoplex to Renato other than to state he believed it to be some sort of sham.
Newcomb testified that he received the buy/sell agreement from Carduco on May 13, 2008.[8] According to Newcomb, he considered the buy/sale agreement a sham, and on May 16, 2008, Newcomb attended a "Network Review Committee" meeting with Tracey Matura,[9] MBUSA's general manager, Frank Berenz, MBUSA's general counsel, and Ernst Lieb, MBUSA's president and chief executive officer. An email written by an MBUSA employee documents that the committee discussed approaching Ron Heller about the McAllen site and that Heller would be required to make efforts to purchase the Harlingen dealership if it came up for sale within five years. The trial court admitted a July 2008 draft of a letter of intent written by MBUSA for Heller-Bird to sign stating, "Heller-Bird agrees to use its best efforts to acquire the Mercedes-Benz dealership in Harlingen, Texas. If acquired, Heller-Bird will consolidate both the McAllen and Harlingen operations into one location at the McAllen location."[10]
Newcomb acknowledged that he had written "notes to [himself] of [the] potential steps in the process if [MBUSA] were adding a new [dealership] in McAllen" and that the process included providing "courtesy notification" to Renato/Carduco of the new dealership. Newcomb testified that this "courtesy notification" was never made. When asked by MBUSA's trial counsel, Newcomb denied that it was MBUSA's expectation that Carduco would fail and that Heller-Bird would then *463 "swoop in and pick up the pieces." Newcomb explained that MBUSA's "expectation always is that we will gain additional business, not business from any of our existing dealers, gain additional business, serve the customers better, both in terms of customer convenience as well as additional services capacity, sales capacity...." Newcomb said that when a new dealer is added, MBUSA's intent is not for the new dealership to take business away from an existing franchise. Newcomb emphasized that MBUSA did not want to take business from existing Mercedes-Benz dealers but instead wanted to take business from its competitor manufacturers. However, evidence was presented that the Heller-Bird dealership in Pharr did take away business from Carduco in Harlingen.
During Newcomb's testimony, Carduco's trial counsel played excerpts from Newcomb's deposition. In one excerpt, Carduco's trial counsel asked, "Would you agree with me that the [market] analysis would reflect that there would be a substantial impact in any effectiveness analysis with respect to the Harlingen AOI after the addition of the" Heller-Bird dealership? Newcomb replied, "Yes."
The jury heard evidence that on September 24, 2008, Renato, Frank Oswald, and Craig Dearing attended a meeting where Dearing took notes entitled "buy/sell discussions." Evidence was presented that the notes were circulated to and edited by MBUSA's executives who were not present during the meeting so that they could "be comfortable" with the reflected conversations and that once the edited "memorialization" had been approved by MBUSA's executives, Dearing instructed everyone to destroy any earlier drafts of the notes "to ensure that no conflicting documents existe[d]." Specifically, Holt testified that Oswald and Dearing took written notes at their meeting with Renato, that Dearing typed his notes, sent the typed version to Holt, among others, asked if Holt was "comfortable" with the notes, indicated that other MBUSA employees who were not present at the meeting had revised his originally circulated notes, and then stated, "The previous document, please destroy, delete to ensure no conflicting documents exist." Holt agreed that the "original document" was destroyed.[11] However, even the edited notes showed that Renato intended to move Carduco to McAllen.
Dearing testified that although he used the term "buy/sell discussions" in his type-written notes, he was not familiar with that term. Carduco's trial counsel played a portion of Dearing's deposition where he was asked which MBUSA employee is usually responsible for engaging in buy/sell discussions with prospective dealers, and Dearing replied, "That, typically speaking, is somebody that's in charge of franchise development at the regional level and is also at the national level." During his deposition, Dearing responded that, at that time, Newcomb was in charge nationally for franchise strategy and that he could not recall who was responsible regionally. After playing these portions of the deposition, Carduco's trial counsel asked if Dearing took it upon himself to engage in buy/sell discussions with Renato. Dearing replied, "No, I wasn't involved in buy/sell discussions. What I was involved with was doing a special tool and equipment survey...."
During Dearing's testimony, Carduco's trial counsel referred to plaintiff's exhibit 21, a letter dated July 21, 2008, and addressed to Carduco's attorney at the time from Tom Waters, an MBUSA employee.
*464 The letter from Waters stated, "We need the opportunity to speak with [Renato] to discuss his plans for conducting Mercedes-Benz operations in the dealership facility. Please advise if we can contact him directly to schedule this conference." Dearing testified that he was not aware that MBUSA wanted to speak to Renato regarding his plans for the facility. Dearing did not know who at MBUSA would have conducted this interview of Renato that MBUSA requested. Dearing denied that he had conducted said interview and that he had communicated with Waters regarding such an interview. Dearing agreed that he first went to Harlingen and conducted a special tools inventory before he traveled to Brownsville to meet with Renato in his office to discuss the inventory.
Dearing acknowledged that his typed notes indicated that one of his questions to Renato was "what are your present plans for the dealership?" Dearing could not recall taking notes during his meeting with Renato but "surmise[d]" that he had "probably had done it on paper ...." and "most likely" taken handwritten notes. Dearing testified that eventually he typed his notes. Dearing testified that he has not attempted to find his handwritten notes taken during the meeting with Renato. Dearing acknowledged that he revised the notes he took at his meeting with Renato and that he circulated a copy of the revised typed notes to Holt, among others. Dearing "could not say" how many revisions he made when he transcribed his handwritten notes into a word processing document. Dearing claimed that generally, he only keeps the final version of his notes so that he does not become confused. When asked if he told the recipients of the revised notes to destroy the previous document, Dearing said, "I'm sure I did." Dearing testified that he asked MBUSA employees who had not attended the meeting with Renato for comments on his notes because he wanted to ensure that "everyone receives and is comfortable with the information that's going to be conveyed, especially to a prospective new dealer." Dearing agreed that the purpose of the notes was to convey to MBUSA what Renato had communicated to Dearing during the meeting. Dearing testified that he documented that Renato was told that MBUSA wanted to be transparent and agreed that meant being open and honest. Dearing testified that he did not include everything that was discussed at the meeting with Renato in his notes and that the notes were not "intended to go ahead and be all encompassing." Carduco's trial counsel asked, "Buy/sell discussions[ ] that was your term, right, Mr. Dearing?" Dearing replied, "It was, and it was inaccurate. By reading this today, that was an inaccurate statement on my part."
Dearing denied knowing that Heller-Bird was opening a new dealership in the McAllen area and claimed that all he knew was that MBUSA was conducting "open point discussions."[12] The trial court admitted an August 5, 2008 email from Holt to Dearing and Oswald stating, "The buy/sell is still going forward with Rene and his father. We are still working on adding a new point in McAllen. This is not to be made public." Dearing testified that although the email does not state "open point," from his perspective, when Holt said "new point," he was referring to an open point, which is not the same as opening a new dealership.
According to Dearing, prior to his meeting with Renato, he flew to Chicago and *465 met with Holt to discuss his special tool and equipment survey and during his conversation with Holt, he learned that an "open point" existed in McAllen.[13] Dearing testified that he then asked Holt whether he should tell Renato about this open point in the McAllen area. Portions of Dearing's deposition were then played for the jury, which included the following colloquy:
Q: Did you ever suggest to anybody that Carduco, Inc. should be informed about the decision to award the Heller-Bird dealership in the McAllen area prior to Carduco, Inc.'s closing on its acquisition of the Harlingen dealership?
A: Yes.
Q: Who did you make that suggestion to?
A: Jack Holt.
Q: When did you make that suggestion?
A: Probably prior to when I went down to do the special tool analysis.
Q: What did Mr. Holt say in response?
A: He said 'no.'
Carduco's trial counsel also played the following portion of Dearing's deposition:
Q: When you informed Mr. Holt that Carduco shouldn't be made aware of this possibility, he informed you, that Mercedes-Benz would not be letting Carduco know of that fact [that a new dealership was planned in the McAllen area], correct?
A: What I was trying to state is that I don't know during that time frame one way or another whether or not it was Heller-Bird, other than there was some buy/sell discussions of a new point in the McAllen area, and that was the limitations of what-
Dearing stated that he instructed Renato to develop two plans based on his desire to move to McAllen in the future. Dearing acknowledged that because he is not familiar with the process of relocating a dealership, he did not tell Renato exactly what he needed to do in order to get approval from MBUSA to move Carduco to McAllen. Dearing did not tell Renato that a point had opened in the McAllen area.
Rene and Renato testified that Oswald and Blakemore traveled with Rene to look at sites Renato believed would be good locations to move Carduco into the McAllen area. Holt testified that although Heller-Bird had already signed its dealership agreement with MBUSA to open its dealership in McAllen, neither Oswald nor Blakemore told Renato or Rene about the Heller-Bird dealership. Instead, Renato was instructed to present the sites to Holt for his final approval. During his testimony, Holt agreed with Carduco's trial counsel that it would have been misleading for Oswald to travel to sites in the McAllen area with Carduco's representatives and withhold that Heller-Bird had already been approved in McAllen.
Ernest Manuel, Ph.D., Carduco's expert regarding the car dealership business, testified that an AOI is assigned to one dealership in the auto industry, and that once Heller-Bird opened, MBUSA defined separate "AOIs for Harlingen and for San Juan, as part of the process, [MBUSA] decided apparently to give [the Starr County] zip code" to the Laredo Mercedes-Benz dealership. Regarding Carduco's and Heller-Bird's AOI, Dr. Manuel testified that MBUSA "divided the market between Harlingen and San Juan" and MBUSA
*466 "pulled out" one zip code that went to Laredo and then they divided the valley into two parts. Dr. Manuel testified that after MBUSA reassigned some of the zip codes in Carduco's AOI to Heller-Bird, Heller-Bird's AOI included 66.4% of the total population of the Rio Grande Valley and that in his opinion, those customers would more than likely shop at the dealership-Heller-Bird-that was closer to them and more convenient. Regarding the higher income households, that is, those who make at least $100,000 per year, Dr. Manuel stated that two-thirds of those households were within Heller-Bird's AOI, while only one-third was in Carduco's AOI.
Dr. Manuel testified that as far as sales were concerned, sixty-five percent of the Mercedes-Benz buyers were located in Heller-Bird's AOI and the other one-third were in Carduco's AOI. Dr. Manuel explained that based on an analysis of Carduco's sales before and after Heller-Bird's opening, he created several maps showing a decline in Carduco's sales to customers from the west side of the Rio Grande Valley where Heller-Bird was located. Dr. Manuel said that prior to the Heller-Bird dealership, Carduco sold the majority of its Mercedes-Benz vehicles to customers from the McAllen and Mission, Texas areas.[14] However, once Heller-Bird opened, Carduco's sales to customers from the west side of the Valley had "very much thinned out" in the first nine months of 2011. Dr. Manuel said, "[Heller-Bird] of San Juan is taking all of that business over there." Dr. Manuel specified that in 2010, Carduco sold sixty-three Mercedes-Benz vehicles to customers from the east side of its AOI and ninety-two to west-side customers, but once Heller-Bird opened in 2011, although Carduco's sales to customers from the east side went up slightly to eighty-five, it's sales to customers from the west side of the Valley went from ninety-two to thirty-one, down by 66.3 percent. Dr. Manuel opined, "Overall, in that first nine months, Carduco's sales declined twenty percent even though the market was going up. The market was better in 2011 than 2010, so even despite that, Carduco's sales went down almost 20 percent just in the first nine months." According to Dr. Manuel, for the full year, Carduco's sales to customer from the "San Juan side" were "down to almost 70, 69.85" percent. Dr. Manuel said, "So, in other words, the impact was growing over time."
Dr. Manuel testified that the same decline occurred to Carduco's repair and services department after Heller-Bird opened. Dr. Manuel explained, "The inference, the logical inference that you would make is people who had Mercedes-Benz [vehicles] and lived on the west side of the market found it more convenient to take their car into San Juan [Heller-Bird] and get it serviced there rather than drive over to Harlingen and get it serviced in Harlingen. So a big chunk of that service business just disappeared." According to Dr. Manuel, Carduco's service business for customers from the San Juan area declined by 76.85 percent. Dr. Manuel said, "So more than three-fourths of the Mercedes-Benz on that side of the market that Carduco had been servicing the prior year went to [Heller-Bird] of apparently went to [Heller-Bird] because there's no-the business just disappeared." According to Dr. Manuel, due to losing customers from the west side of the Valley, overall Carduco's service business declined by 51.86 percent in the nine months after Heller-Bird opened in San Juan compared to the nine months before it opened. Dr. Manuel said, "It's a very obvious impact from the San Juan store on Harlingen because two-thirds of *467 the high-income households are on that west side of the market."
Dr. Manuel opined "that the reason [Carduco's] sales fell off in 2011 and 2012 to a reasonable degree of certainty is that it was caused by the opening of" Heller-Bird in San Juan at the end of 2010. When asked if that surprised him, Dr. Manuel said, "No. Given the demographic data that I looked at at the beginning where the market was carved up and two-thirds going to the west side [ (Heller-Bird side) ] and one-third going to the east side [ (Carduco side) ], that followed pretty much the way I expected it would." Dr. Manuel disagreed with MBUSA's witnesses who had testified that the impact of opening Heller-Bird in the Valley to Carduco would only have a short-term effect and said, "This is over two years now. We had 2010, and this 2011, 2012. So for at least two years now we have a significant loss." Dr. Manuel testified that MBUSA would have the same standards he used in determining Heller-Bird's impact to Carduco and that under those standards, "we're talking about roughly between 180 and 200 lost sales per year in those two years" to Carduco.
Dr. Manuel testified that MBUSA has only 352 dealerships in the United States, and "[t]hat's about one Mercedes-Benz dealer for every 3.5." Dr. Manuel stated that he did not think that the Valley could support more than one Mercedes-Benz dealership. On cross-examination by MBUSA's trial counsel, when asked whether the dealer agreement stated that MBUSA could alter or adjust a dealer's AOI at any time, Dr. Manuel replied, "That's what it says, but it's not true. It's not a true statement.... [T]hat provision is constrained by Texas law" and "I'm just saying that the agreement is constrained by Texas law in its operation as what Mercedes-Benz can and cannot do to the AOI and the dealer network." Although Dr. Manuel agreed that Texas law does not give a dealer an "exclusive right to an AOI," he explained, "[i]t gives the dealer a right to protest a change in the AOI or the addition of another dealer or relocation of another dealer within the-within certain geographic parameter of the existing dealer." Dr. Manuel stated that although the dealer agreement stated that there was no guarantee that Carduco would be the only dealer in the Valley, "Texas law does have provisions protecting the rights of dealers from market power of manufacturers. That's why the law exists."
Dr. Manuel disagreed with MBUSA's trial counsel, who stated that when MBUSA adds another dealer in an existing dealer's AOI in a different county more than fifteen miles away, the existing dealer could not protest. Dr. Manuel responded, "I disagree with the hypothetical because if you were to put another dealer in your AOI, just like we saw in this instance, when they [MBUSA] wanted to put [Heller-Bird] in the [Valley] AOI ... what did [MBUSA] do? They carved it up into two pieces. Part of the AOI went to [Heller-Bird] and part went to [Carduco]." Dr. Manuel concluded "you couldn't put a new dealer into an existing dealer's AOI without changing the AOI. You have to give the new dealer a territory."
MBUSA's trial counsel asked, "But if a dealer is added into a market before changing the AOI, that's not changing the dealer agreement, is it?" Dr. Manuel replied, "But you can't really do that because you couldn't put a dealer in without giving them a franchise agreement and the franchise agreement calls for them to have an AOI. So how [could you] put a dealer into an existing AOI without giving them an AOI in the first place? It would violate their own standard provisions. It can't happen." MBUSA's trial counsel asked, *468 "Dr. Manuel, you say that can't happen, but it did happen, didn't it?" Dr. Manuel replied
Because [MBUSA] didn't assign an AOI to the new dealer until after it was in, which would be in violation of its own contractual provisions about assigning AOI's. It says right here 'MBUSA will assign the dealer a geographic area consisting of a collection of zip codes or census tracks that is called an area of influence.
[MBUSA] didn't do that at first when it put [Heller-Bird] in. It violated its own contract provision. Later on, it finally did carve out that AOI.
When asked by Carduco's trial counsel, "Did anything in the evidence [you reviewed] indicate to you anything other than that [MBUSA's] plan was to have one dealership in the Valley," and Dr. Manuel responded, "No. The [MBUSA] documents were fairly consistent about that, one dealership,-[Heller-Bird] was to buy out [Carduco], The draft letter of intent said buy out Harlingen and close it. So the market studies, one dealership, so it was fairly consistent."
C. The Jury's Basis for Fraud
Viewing the evidence in the light most favorable to the jury's verdict, crediting favorable evidence that reasonable jurors could have, and disregarding contrary evidence unless reasonable jurors could not, the evidence supports a finding that the Rio Grande Valley, Carduco's AOI, could only support one Mercedes-Benz dealership and MBUSA was aware that opening the Heller-Bird dealership in the McAllen area would have a negative effect on Carduco's business. See City of Keller v. Wilson, 168 S.W.3d 802, 808 (Tex.2005) (explaining that in reviewing the jury's verdict for legal sufficiency, an appellate court considers all of the evidence in the light most favorable to the prevailing party, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not"). Holt asked his superior, Bob Neis, whether he could tell Renato about the Heller-Bird deal prior to Renato's purchase of Autoplex because according to Holt "[the Heller-Bird dealership] could affect the buy/sell between Rene and his father." However, Neis told Holt, "Hold off, Hold, off ... do not do anything ... let's talk ... Repeat ... do nothing ... hold off."[15] Rene testified that MBUSA "informed" him that based on a market study, MBUSA "would not put another dealer" in Autoplex's AOI, which included the entire Rio Grande Valley "because the market could only support one dealer." Evidence was presented that despite market studies that the Rio Grande Valley could only support one Mercedes-Benz dealership, MBUSA encouraged Heller-Bird to open its dealership in McAllen within days of Carduco's intended purchase of Autoplex and also encouraged Heller-Bird to purchase Carduco if it became available for sale. In addition, although there is no evidence that the draft letter of intent had been presented to Heller-Bird, MBUSA stated in the letter that Heller-Bird would be required to purchase the Harlingen dealership, consolidate it with the McAllen dealership, and then close the Harlingen dealership.
Moreover, although MBUSA claimed that it could not tell Carduco about the Heller-Bird dealership due to concerns about privacy, Holt agreed that once the *469 Heller-Bird dealership contract had been signed, there was no reason not to tell Renato. The evidence showed that even after Heller-Bird signed its dealer agreement, MBUSA failed to tell Renato about the Heller-Bird deal-at which time, Renato had not yet signed the buy/sell contract. And, although Holt believed that the Heller-Bird deal could affect the buy/sell of Autoplex and Renato had not yet signed the agreement, MBUSA failed to tell Renato about the Heller-Bird deal.
Rene testified that although he no longer owned the Mercedes-Benz dealership, MBUSA asked that he be present for a meeting that occurred on August of 2009 with Holt. Rene questioned why MBUSA requested his presence at this meeting given that he no longer owned Autoplex. At this meeting, Holt informed Renato and Rene that Carduco would not be allowed to move to McAllen and that another Mercedes-Benz dealership would be opening in McAllen. Based on, among other things, Holt's reaction to the sale from Rene to Renato, the jury could have reasonably inferred that Holt wanted Rene present to see his reaction and to send a message to Renato and Rene that he believed that their in-family sale to be a "sham."
Evidence was presented that once the Heller-Bird Mercedes-Benz dealership was completed and operating, MBUSA informed Carduco that it was "implementing a realignment of certain zip codes," and it reassigned the most affluent demographic areas of Carduco's AOI to Heller-Bird. It was also shown that MBUSA knew that Carduco's business in Harlingen would decline significantly once the Heller-Bird dealership started selling Mercedes-Benz vehicles, and that is exactly what occurred.
Thus, because the evidence supports a finding that the fraud in this case was more than merely oral representations that directly contradicted the terms of the contract and prevented the coming into existence of a valid contract, Playboy does not apply. See Schlumberger Tech. Corp., 959 S.W.2d at 179. Moreover, the jury could have based its finding of fraud on a reasonable inference that because MBUSA could not prevent the sale of Autoplex from Rene to Renato, MBUSA "tr[ied] to work around this" sale by devising a scheme to negatively affect Carduco's business in an effort to "terminate" what MBUSA viewed as "the Cardenas's" dealership, which was "a sham."[16] In addition, because the evidence is conflicting regarding whether MBUSA had already approved Autoplex's move to McAllen and that therefore Carduco merely needed to get Holt's approval for a site, the evidence supports the jury's implied finding that MBUSA had already approved a move to McAllen. And, the dealer agreement does not state that once a relocation had been approved, MBUSA could revoke its permission.[17]
*470 Moreover, the spoliation instruction given to the jury stated that it could presume that evidence that MBUSA destroyed, lost, or failed to produce "would have been unfavorable to" MBUSA.[18] Although this less severe spoliation instruction does not shift the burden of proof to the spoliating party, it "at least allows an inference to support facts that the missing evidence would have established." Wackenhut Corr. Corp. v. De La Rosa, 305 S.W.3d 594, 594, 626 (Tex.App.-Corpus Christi 2009, no pet.), overruled on other grounds by Zorrilla v. Aypco Constr. II, LLC, 469 S.W.3d 143, 151-52 (Tex. 2015). We have held that this less severe spoliation instruction "allows a nonspoliating party to withstand a legal sufficiency challenge to the elements that the spoliated evidence would have proved, because the instruction itself allows an inference of the facts that evidence would have proved."[19] Id. at 626. In addition, the jury heard evidence that MBUSA intended for Heller-Bird to purchase Carduco from Renato, then consolidate the Harlingen dealership with the McAllen dealership, and shut down the Harlingen site. This would thus leave only one dealership in the Rio Grande Valley, which further supports the jury's implied finding that when it entered into the Dealer Agreement with Carduco, MBUSA sought to "work around" the sale by attempting to negatively affect Carduco's business[20] by reneging on its approval of the Harlingen dealership's move to McAllen,[21] by adding another dealership in McAllen, by awarding the more affluent area codes to Heller-Bird, and by negatively affecting Carduco's business.
The alleged non-disclosure regarding exclusivity and getting written permission to move matter not if the jury found that MBUSA failed to disclose that MBUSA had entered the dealer agreement with the intent to "work around" the sale and "terminate" Carduco's dealership by allowing Heller-Bird to open a second dealership in McAllen when the market in the area could not sustain more than one dealership in order to force Carduco to sell its franchise to Heller-Bird.
Moreover, Carduco presented evidence that although Renato knew that Carduco's business would possibly suffer if another dealership opened in Carduco's AOI, MBUSA failed to disclose its plan to open the Heller-Bird dealership in McAllen and instructed Oswald to tell Chappell he was *471 unaware of any deals.[22] Thus, the jury was free to believe that MBUSA would have achieved its goal of "working around" the sale by opening the Heller-Bird dealership and negatively affecting Carduco's business.[23] If the jury determined that MBUSA signed the Dealer Agreement with the intent to cause Carduco harm, it could have found that MBUSA committed fraud on that basis alone.[24] See Aquaplex, Inc. v. Rancho La Valencia, Inc. , 297 S.W.3d 768, 774 (Tex.2009) ("A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made."); see also TEX. OCC.CODE ANN. § 2301.478 (West, Westlaw through 2015 R.S.) (providing that franchisor owes franchisee a duty of good faith and fair dealing that is actionable in tort); Subaru of Am., Inc. v. David McDavid Nissan, Inc. , 84 S.W.3d 212, 225-26 (Tex.2002) ("[T]he Legislature expressly provided a statutory duty of good faith and fair dealing among parties to a car dealership franchise agreement. And, the Legislature made this duty 'actionable in tort.' ").
Newcomb agreed that the process for bringing Heller-Bird into Carduco's AOI included providing notification to Carduco of the new dealership. And, there was evidence that although MBUSA had decided to award the McAllen area dealership to Heller-Bird, MBUSA instructed Oswald to tell Chappell[25] he was unaware of any other dealerships opening in Autoplex's AOI.[26] In deposition testimony played for the jury, Carduco's trial counsel asked, "For Mr. Oswald to inform the dealer that he is not aware of decisions being made by MBUSA in this direction [adding a new McAllen area dealership], that statement is true or untrue?" Newcomb replied, "In this context untrue, I suppose." From Holt's August 2008 email to Oswald and Dearing, the jury could have reasonably inferred that Oswald and Dearing were aware of the Heller-Bird deal prior to Chappell's phone call. Oswald testified that after Chappell inquired about the new McAllen-area dealership, Oswald spoke to Holt on the phone. According to Oswald, Holt said, "I [Oswald] wasn't aware of any decisions and I [Oswald] didn't need to know about that stuff." Thus, it is possible that the jury made an implied finding that MBUSA misled Carduco about the Heller-Bird deal, and that constituted a misrepresentation. And, because this finding of misrepresentation does not contradict *472 the terms of the dealer agreement that MBUSA has cited on appeal, Playboy does not apply. Therefore, the jury's finding that Carduco justifiably relied on this misrepresentation is not insufficient as a matter of law.
D. The Dealer Agreement
We also disagree that the alleged misrepresentations and non-disclosures as MBUSA claims the jury found directly contradict the contract. Although the contract does not grant Carduco the right to sell the cars exclusively in its AOI, it does not state that MBUSA could add another dealership to Carduco's AOI even if that area was unable to economically maintain more than one dealership, and if doing so would cause Carduco to fail, as the evidence shows MBUSA intended.[27] In other words, although the contract did not give Carduco the right of exclusivity, it did not prohibit MBUSA from agreeing that, if the market could not support more than one dealership, MBUSA would not place another dealership in the AOI, especially given that evidence was presented that doing so would negatively affect Carduco. Thus, to the extent that the jury may have found that MBUSA misrepresented to Carduco that it would not open a new dealership in its AOI because the market could not support a second dealership, there is no direct contradiction.
Moreover, Holt agreed that either Rene or Renato had a statutory right to protest the Heller-Bird deal, if, prior to Heller-Bird signing the dealer agreement, either one discovered MBUSA's intent to give Heller-Bird the McAllen site.[28] Thus, if the jury found that MBUSA had implied that although MBUSA had the right to assign other dealers to Carduco's AOI, MBUSA would not do so because the market could not support more than one dealer and that it would harm Carduco's business, there is no direct contradiction with the contract. In fact, Holt testified that as the regional franchise manager, his "sole position is to try and assist [MBUSA's] dealers to perform the best they can, have [the] dealerships be in the best location...." The jury could have reasonably found that MBUSA does not usually grant a franchise to one owner and then place a second franchise in that AOI if doing so would cause either franchise to fail. Dr. Manuel's testimony supports such a finding because if MBUSA understood that it had the right to place more than one dealership in Carduco's AOI, MBUSA would not have then created a second AOI for Heller-Bird.
Thus, unlike in Playboy, there was evidence in this case that exclusivity in an AOI depended on certain factors, which included whether the AOI could have supported more than one dealership without negatively affecting the other dealership's business. In Playboy, the issue was not whether Playboy Enterprises sought to push the plaintiff out of business but was whether Playboy Enterprises had the contractual right to revoke permission from the plaintiff to sell its magazines in the *473 United States, a right that the contract absolutely gave to Playboy Enterprises. Playboy Enters., Inc., 202 S.W.3d at 258.
Moreover, Rene testified that the asset purchase agreement did not contain a provision that Carduco would move to Hidalgo County because such a provision would only be necessary "if you had another existing dealer in that county that was able to protest" and Carduco's AOI included the entire Rio Grande Valley, which MBUSA had already determined could only support one dealer. Thus, the jury could have determined that based on Rene's experience of buying and selling dealerships, this was the custom and practice of automobile dealerships. There was also evidence through Rene's testimony that the only approval from MBUSA that Renato needed to move Carduco to McAllen was site-approval from Holt. In addition, Holt testified that MBUSA already had approved the move to McAllen, pending approval of the specific site. From this evidence, the jury could have reasonably inferred that MBUSA intended for Renato to believe that he had prior permission to move Carduco to McAllen because there would be no need for MBUSA to approve any site in McAllen if MBUSA intended to deny permission to move or if he did not already have the requisite prior permission. And, the contract required prior written permission to actually relocate a dealership. There is no evidence in the record that MBUSA would not have given written approval for the move, especially given that MBUSA requested that the Harlingen dealership move to McAllen. Thus, if the jury found that MBUSA had already granted permission to move, it could have reasonably inferred that the permission would have been given in writing as set out in the dealer agreement. Or, the jury could have reasonably found that the written permission would be forthcoming because according to the terms of the agreement, Carduco needed written permission to actually move or relocate. Here, Carduco had not actually moved or relocated. Moreover, based on Holt's testimony that Autoplex already had approval to move, the jury could have reasonably inferred that it had been provided to Autoplex in writing.
Misrepresenting to Renato that Carduco already had prior written permission to move to McAllen does not contradict the contract's clause that Carduco could only move with prior written permission, especially given that the contract does not state that MBUSA could deny Carduco permission to move. In fact, at his deposition, which was played for the jury, Newcomb testified that the "reason" MBUSA did not approve Carduco's move to McAllen was because MBUSA "had plans, other plans, and-to put a dealership in San Juan, Heller-Bird, yes." When Carduco's trial counsel asked, "There is no other reason that you know of for denying Carduco's application to relocate to McAllen, correct," Newcomb said, "That's how I testified, yes, sir." According to Renato, he and MBUSA were in the process of moving Carduco to McAllen-which the evidence showed requires final approval by Holt of the purposed site. The contract does not address the process of acquiring written permission to move a dealership. It may well be as Rene and Holt explained that once the dealer asks to move in its AOI, permission is not denied. Moreover, here, the evidence supports a finding that MBUSA asked Rene to move the dealership to McAllen. Therefore, whether MBUSA could or could not deny the requested move is a question of fact for the jury to have determined. Further, based on the spoliation instruction, the jury could have reasonably inferred that Blakemore's and Neis's missing emails contained evidence that, at the meeting with Dearing and *474 Oswald and when MBUSA representatives accompanied Renato and Rene to look at potential sites to move Carduco, Renato believed that Carduco had its approval to move to McAllen because MBUSA had already provided such permission to Rene and that Renato merely needed Holt to approve the chosen site. The jury could have reasonably found that Renato was aware that the contract did not give MBUSA the ability to unreasonably withhold written permission. And, MBUSA acknowledged that it was standard to approve a dealership's move from one site to another within its AOI. Thus, the jury was free to believe that MBUSA would not have been able to deny Carduco's request to move as there was no reason to deny it absent the Heller-Bird deal.
In Playboy, we concluded that the plaintiff could not have justifiably relied on an oral representation that the plaintiff could sell its Spanish magazines in the United States because the contract directly contradicted that representation by stating that the plaintiff needed prior written approval that Playboy Enterprises could revoke at any time. Playboy Enters., Inc., 202 S.W.3d at 258. We did not explain the reason for our conclusion in the opinion, but the contract in Playboy allowed Playboy Enterprises to revoke the prior written permission at any time. Id. Here, there is no clause allowing MBUSA to revoke permission once it was given. In addition, the jury heard evidence that under Texas law, MBUSA could not unreasonably withhold permission from Carduco to move. Thus, there is no direct contradiction with the jury finding that MBUSA had already approved the Harlingen dealership's move to McAllen and the contract's clause stating that Carduco needed prior written permission to move because Carduco had not yet moved to McAllen.
In addition, the contract required for MBUSA to have acted in a manner that would not have harmed its dealers' businesses. See TEX. OCC.CODE ANN. § 2301.478 (providing that franchisor owes franchisee a duty of good faith and fair dealing that is actionable in tort); Subaru of Am., Inc., 84 S.W.3d at 225-26 ("[T]he Legislature expressly provided a statutory duty of good faith and fair dealing among parties to a car dealership franchise agreement. And, the Legislature made this duty 'actionable in tort.' "). Reading the contract as granting MBUSA the right to alter Carduco's AOI or to add new dealerships in a manner that would harm Carduco's business and cause it to suffer substantial losses condones acts that the jury found constituted fraud by entering into an agreement with the sole purpose of sabotaging a franchisee, which Playboy does not allow.[29] See Id. And, such a finding is supported by evidence that MBUSA wanted to "work around" the sale and terminate Carduco.[30] In addition, MBUSA's *475 non-disclosure that it planned on bringing in a second dealership for the sole purpose of forcing Carduco out of business is not directly contradicted by the contract because the contract does not address such an issue.
Finally, MBUSA asks this Court to interpret the contract in a manner that it did not prove is allowed under Texas law. MBUSA argues that the contract allowed it the absolute right to deny Carduco written permission to move to McAllen, and that Renato could not rely on any oral representations that Carduco could move to McAllen. However, as Carduco points out, automobile dealerships are heavily regulated in Texas, and the Texas Occupations Code governs relocation of dealerships. Under the Texas Occupations Code, MBUSA could not deny Carduco's relocation request unless it had proven, among other things, it had reasonable grounds to deny the relocation. See TEX. OCC.CODE ANN. § 2301.464(2) ("If the applicant files a protest with the board, the board makes a determination of reasonable grounds."). And, no evidence was presented that MBUSA would have protested Carduco's move or that reasonable grounds existed for MBUSA to deny Carduco's move prior to MBUSA's deal with Heller-Bird. Thus, even though Renato was aware that he was required to receive MBUSA's prior written permission to move to McAllen, the law in Texas did not allow MBUSA to deny the move absent reasonable grounds. Here, MBUSA subsequently denied Carduco's request to move to McAllen because it had already signed a dealer agreement with Heller-Bird after allowing Renato to believe that Carduco would be moving to McAllen and had failed to tell Renato that it was negotiating with Heller-Bird to open its dealership in McAllen.
A finding by the jury that Texas law trumps the contractual language was further supported by evidence that, although the standard provisions of the dealer agreements gave MBUSA the right of first refusal, under Texas law, MBUSA could not prevent Rene's sale of Autoplex to Renato, causing Holt to say, "There is no God." Moreover, the jury was free to infer from MBUSA's conduct that it could not have relied on the contract's clause to deny Renato's request to move to McAllen because it did not have a reasonable basis and that is the reason MBUSA secretly entered into the Heller-Bird deal. Given that there was evidence that the dealer agreement's contractual terms must comply with Texas law and that Texas law trumps any terms that do not comply, we conclude that it was MBUSA's burden to prove at trial and on appeal that the cited-to contractual terms regarding relocation and exclusivity comply with Texas statutory law.[31] And, because they did not do so, the evidence is sufficient to support the jury's implied findings. We overrule MBUSA's first issue.
*476 III. DISCLAIMER OF RELIANCE
By a second issue, MBUSA contends that Carduco's contractual promise that it was not relying on any oral representations negates the reliance element of its claims as a matter of law. MBUSA points to language in the Dealer Agreement stating that Carduco promised that (1) "no representations outside of the contract were made by MBUSA and its agents," and (2) "no such representations or statements were relied upon by Carduco in executing the contract." MBUSA further argues that the subject of relocation had been discussed by the parties, Carduco was represented by counsel in an arm's length transaction, and Renato is an experienced, sophisticated party with many successful decades of experience in the car business.
First, we must determine whether there was "a clear and unequivocal disclaimer-of-reliance clause." Once we have determined that the contract contains a clear and unequivocal disclaimer-of-reliance clause, "our analysis would then proceed to 'the circumstances surrounding [the contract's] formation,' in order to determine whether such a provision is binding on the parties involved." Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am., 341 S.W.3d 323, 337 n.8 (Tex.2011).
"This would include an analysis of whether 'the terms of the contract were negotiated, rather than boilerplate;' during negotiations 'the parties specifically discussed the issue which [became] the topic of the subsequent dispute;' 'the complaining party was represented by counsel;' 'the parties dealt with each other in an arm's length transaction;' and 'the parties were knowledgeable in business matters.' "
Id.
In the pivotal case of Schlumberger Technology Corporation v. Swanson, 959 S.W.2d 171 (Tex.1997), the Texas Supreme Court set out an exception to the general rule that a party may not avoid a promise obtained by deceit by means of contractual devices. Italian Cowboy Partners, 341 S.W.3d at 332. The Italian Cowboy court noted that in Schlumberger, the contracting parties "had long been embroiled in a dispute over the feasibility of a mining project, and were 'attempting to put an end to their deal.' " Id. at 332-33. (citing Schlumberger, 959 S.W.2d at 180 ). The Italian Cowboy court stated, "Given the circumstances surrounding the settlement agreement's formation, [the Schlumberger court] determined that the disclaimer-of-reliance clause had the 'requisite clear and unequivocal expression of intent necessary to disclaim reliance ... on specific representations by Schlumberger,' and thus the clause effectively precluded a claim for fraudulent inducement." Id. at 333. The same cannot be said in this case because there is no evidence that MBUSA and Renato had been embroiled in any disputes when Renato signed the Dealer Agreement. In addition, the Italian Cowboy court emphasized that in Schlumberger, "the intent to disclaim reliance on others' representations-that is, to rely only on one's own judgment-was evident from the language of the contract itself," which stated, "[N]one of us is relying upon any statement or representation of any agent of the parties being released hereby. Each of us is relying on his or her own judgment...." Id. at 335. No such language is included in the alleged disclaimer in this case, which stated, "Dealer acknowledges that no representations or statements other than those expressly set forth therein were made by MBUSA or any officer, employee, agent, or representative thereof, or were relied upon by Dealer in entering into this Agreement." Thus, this is not a case *477 where the parties clearly and unequivocally disclaimed reliance in the contract.
Moreover, in the charge, the jury was instructed that the "Dealer Acquisition" referred to both the Asset Purchase Agreement (the buy/sell agreement) and the Dealer Agreement. The jury found that MBUSA committed fraud in inducing Carduco into the Dealer Acquisition. Thus, the jury found that Carduco was fraudulently induced into entering both the Asset Purchase Agreement and the Dealer Agreement. However, the Asset Purchase Agreement does not contain a disclaimer of reliance. Only the Dealer Agreement contains what may be construed as a disclaimer of reliance. MBUSA does not address how the alleged disclaimer of reliance applied to the Asset Purchase Agreement. And, because the jury found that MBUSA had also fraudulently induced Carduco into entering the Asset Purchas Agreement and it does not contain a disclaimer of reliance, we cannot conclude that MBUSA has shown that the parties clearly and unequivocally disclaimed reliance.
Moreover, we agree with Carduco that even assuming that the contract contains a disclaimer of reliance, several of the other Italian Cowboy factors have not been satisfied in this case for us to conclude that it is binding on Carduco. First, it is obvious that the terms of the Dealer Agreement were not negotiated by the parties and that the disclaimer is boilerplate. In fact, the disclaimer appears in a separate unsigned document entitled "Mercedes-Benz Passenger Car Dealer Agreement Standard Provisions."[32] Although generally boilerplate language in a contract is binding, our analysis under Italian Cowboy includes determining whether the term was negotiated and not boilerplate. Italian Cowboy Partners, Ltd. , 341 S.W.3d at 337 n.8. Therefore, because we have no evidence that the disclaimer of reliance in this contract was negotiated, and it is admittedly boilerplate, this factor weighs in favor of Carduco's claim that the disclaimer is not binding on the parties in this case, which is further supported by the fact that no one signed the separate document purporting to disclaim any reliance. See Id.
In addition, a disclaimer of reliance conclusively negates the element of reliance in a suit for fraudulent inducement only if the parties disclaimed reliance on representations about a specific matter in dispute. Italian Cowboy Partners, Ltd., 341 S.W.3d at 332. Here, there is no evidence that Carduco's move to McAllen or that the Heller-Bird deal was in dispute at the time the parties entered into the contract. In fact, MBUSA does not claim that anyone from MBUSA ever informed Renato that MBUSA would deny Carduco permission to move to McAllen or that MBUSA sought to open Heller-Bird in order to sabotage Carduco's business. This is not a case where a " 'requisite clear and unequivocal expression of intent necessary to disclaim reliance' " was made on specific representations made by MBUSA. Id. at 333. Thus, we cannot conclude that the clause effectively precluded a claim for fraudulent inducement. Id. The Texas Supreme Court has held that the "[p]arties should be able to bargain for and execute a release barring all further dispute," and to that end, "parties may disclaim reliance on representations[, a]nd such a disclaimer, where the parties' intent is clear and specific, should be effective *478 to negate a fraudulent inducement claim." Id. (internal quotations omitted) (emphasis added). However, here MBUSA has pointed to no evidence, and we have found none, that MBUSA and Renato bargained for a release barring all further disputes concerning Carduco's move to McAllen or regarding the Heller-Bird deal. See Id. As previously mentioned, there is no evidence that MBUSA negotiated any of the terms of the Dealer Agreement or Standard Provisions with Carduco much less any evidence that the parties bargained for a disclaimer of reliance on any misrepresentations regarding Carduco's move to McAllen or MBUSA's work-around scheme, which involved opening the Heller-Bird dealership in the Valley. Thus, it is not possible for us to say that the parties bargained for and executed a release barring all further dispute regarding this "work around" plan. We conclude that because there were no negotiations or bargaining regarding the terms of the Dealer Agreement, and MBUSA has not shown that there were any disputes regarding the terms of the Dealer Agreement, the disclaimer of reliance is not binding on Carduco and does not bar its fraudulent inducement claim. We overrule MBUSA's second issue.
IV. DUTY TO DISCLOSE
By its third issue, MBUSA contends that "no defendant owed a duty of disclosure in this business transaction, and no evidence supports Carduco's claim on any other theory." Specifically, MBUSA argues that no duty to disclose existed because there were no confidential or fiduciary relationships. Carduco responds that although neither a fiduciary nor confidential relationship existed, a duty to speak may arise in an arms-length transaction when: (1) "one voluntarily discloses information, he has a duty to disclose the whole truth"; (2) "one makes a representation, he has a duty to disclose new information when the new information makes the earlier representation misleading or untrue"; (3) "one makes a partial disclosure and conveys a false impression, he has a duty to speak"; and (4) one knows that the other is about enter into a contract under a mistake as to undisclosed facts, he has a duty to disclose facts basic to the transaction if the other party would reasonably expect a disclosure of those facts because of the relationship between the parties, the customs of trade, or other objective circumstances. See Playboy, 202 S.W.3d at 260.
We agree with Carduco that a duty to disclose arose because there is evidence that MBUSA misled Renato into believing that Carduco had approval to move to McAllen. And, by entering the Dealer Agreement knowing it intended to "work around" the buy/sell agreement, MBUSA created a false impression that MBUSA would not attempt to sabotage Carduco's business by allowing another dealership to open in its AOI. See ids="8461816" index="33" url="https://cite.case.law/sw3d/202/250/#p258">id. Thus, although the evidence supports a finding that MBUSA had already given Carduco permission to move, no one from MBUSA told Renato that that permission would be revoked. The evidence further supports that MBUSA disclosed information about the Valley market and created a false impression that because the Valley could only support one Mercedes-Benz dealership, MBUSA would not put a second dealership in the Valley. It is undisputed that MBUSA did not disclose the new information that a new dealership, which would negatively affect Carduco's business had been approved. And, the evidence supports an implied finding that MBUSA and its employees knew that MBUSA intended to cause Carduco to fail in order to "work around" the buy/sell agreement because MBUSA believed it to be a sham. In addition, although MBUSA
*479 and its representatives Holt, Oswald, and Dearing continued with the steps necessary for Renato to become a Mercedes-Benz dealer, no one informed Renato that MBUSA intended to "work around" the buy/sell agreement by opening Heller-Bird in San Juan, with the hope that Carduco would fail leaving Heller-Bird as the sole dealership in the Valley.
Moreover, as previously explained, the evidence supports a finding that when asked if MBUSA had plans to open a new dealership in the McAllen area, Holt told Oswald to say that he was unaware of any new dealership and the evidence supports an implied finding that Holt and Oswald both knew of the Heller-Bird deal. See ids="8461816" index="34" url="https://cite.case.law/sw3d/202/250/#p258">id. Finally, the spoliation instruction provided that the jury was allowed to presume that the destroyed, lost, or unproduced evidence would have been unfavorable to MBUSA, which supports any factual findings that MBUSA and its employees failed to disclose the truth to Renato. Thus, we conclude that a duty to disclose arose in at least one, if not all, of the following situations: when one voluntarily discloses information, he has a duty to disclose the whole truth; when one makes a representation, he has a duty to disclose new information when the new information makes the earlier representation[33] misleading or untrue; when one makes a partial disclosure and conveys a false impression, he has the duty to speak; and when one knows that the other is about enter into a contract under a mistake as to undisclosed facts, he has a duty to disclose facts basic to the transaction if the other party would reasonably expect a disclosure of those facts because of the relationship between the parties, the customs of trade, or other objective circumstances. See ids="8461816" index="35" url="https://cite.case.law/sw3d/202/250/#p258">id. We overrule MBUSA's third issue.[34]
V. JURY CHARGE
By a fourth issue, MBUSA contends that the jury charge was erroneous because (1) the fraud question commingled multiple theories that are legally defective or lack evidentiary support; (2) the Dealer *480 agreement does not merely contain a merger clause; and (3) the spoliation instruction allowed the jury to draw unspecified adverse inferences.
A. Broad-Form Question
MBUSA first complains that under Casteel, questions one and five in the jury charge commingled seven different theories of fraud liability in a single jury issue that were not supported by the evidence. See Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 388 (Tex.2000). As we understand its argument, MBUSA claims that each definition of misrepresentation and each manner of committing a non-disclosure constitutes a separate theory of liability, which Casteel requires to be charged separately. MBUSA argues that "[b]ecause questions one and five combined seven independent liability theories against four independent defendants, the judgment can stand only if all 28 permutations are legally valid and supported by sufficient evidence" and that all permutations are not legally valid or supported by sufficient evidence. Specifically, MBUSA states it is
Carduco's appellate burden to show that each defendant (1) owed and breached a disclosure duty, and (2) made a false statement of fact, and (3) made a promise of future performance with no intent to keep it, and (4) stated an opinion that was based on a false statement of fact, and (5) stated an opinion known to be false, and (6) expressed a false opinion while claiming to have special knowledge, and (7) engaged in misrepresentation by conduct.
1. Pertinent Facts
Jury question one stated:
Did any of the parties named below commit fraud in the inducement of Carduco into the Dealership Acquisition?
Fraud in the inducement occurs when-
a. a party makes a material misrepresentation,
b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion,
c. the misrepresentation is made with the intention that it should induce the other party into signing or closing an agreement, and
d. the other party actually and justifiably relies on the misrepresentation and thereby suffers injury.
"Misrepresentation" means-
a. A false statement of fact; or
b. A promise of future performance made with an intent, at the time the promise was made, not to perform as promised; or
c. A statement of opinion based on a false statement of fact; or
d. A statement of opinion that the maker knows to be false; or
e. An expression of opinion that is false, made by one claiming or implying to have special knowledge of the subject matter of the opinion. "Special knowledge" means knowledge or information superior to that possessed by the other party and to which the other party did not have equal access.
Fraud in the inducement also occurs when-
a. a party fails to disclose or actively conceals a material fact within the knowledge of that party,
b. the party knows that the other party is ignorant of the fact and does not have equal opportunity to discover the truth, *481 c. the party intends to induce the other party to signing and closing an agreement by failing to disclose the fact, and
d. the other party suffers injury as a result of acting without knowledge of the undisclosed fact.
A false representation by conduct can be established by proof of acts alone or by proof of a combination of conduct and concealment or conduct and words.
A misrepresentation does not have to be made directly to the particular person seeking relief. It is sufficient to show that the misrepresentation was intended or expected to reach the third person and was made with the intent or expectation the third person would rely on it.
A "merger clause" or an "entire agreement clause" is not effective to prevent a claim for fraud in the inducement.
ANSWER YES OR NO FOR THE FOLLOWING:
MBUSA _________________________
Holt _________________________
Dearing _________________________
Oswald _________________________[35 ]
Jury question five stated:
Answer the following question regarding a defendant only if you unanimously answered "Yes" to Question 1 regarding that defendant. Otherwise, do not answer the following question regarding that defendant.
"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.
"Fraud" occurs when-
a. a party makes a material misrepresentation,
b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion,
c. the misrepresentation is made with the intention that it should induce the other party into signing or closing an agreement, and
d. the other party actually and justifiably relies on the misrepresentation and thereby suffers injury.
"Misrepresentation" means-
a. A false statement of fact; or
b. A promise of future performance made with an intent, at the time the promise was made, not to perform as promised; or
c. A statement of opinion based on a false statement of fact; or
d. A statement of opinion that the maker knows to be false; or
e. An expression of opinion that is false, made by one claiming or implying to have special knowledge of the subject matter of the opinion. "Special knowledge" means knowledge or information superior to that possessed by the other party and to which the other party did not have equal access.
"Fraud" also occurs when-
a. a party fails to disclose or actively conceals a material fact within the knowledge of that party,
b. the party knows that the other party is ignorant of the fact and does not have equal opportunity to discover the truth,
c. the party intends to induce the other party to signing and closing an agreement by failing to disclose the fact, and *482 d. the other party suffers injury as a result of acting without knowledge of the undisclosed fact.
A false representation by conduct can be established by proof of acts alone or by proof of a combination of conduct and concealment or conduct and words.
A misrepresentation does not have to be made directly to the particular person seeking relief. It is sufficient to show that the misrepresentation was intended or expected to reach the third person and was made with the intent or expectation the third person would rely on it.
"Malice" means a specific intent by the defendant to cause substantial injury or harm to Carduco.
To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of tern or more jurors. Otherwise, you must not answer the following question.
Do you find by clear and convincing evidence that the harm to Carduco resulted from fraud or malice ?
MBUSA _________________________
Holt _________________________
Dearing _________________________
Oswald _________________________[36 ]
At the charge conference, MBSA objected to jury question one and its instructions on the following bases: (1) "there's no evidence of fraud"; (2) the phrase "in the inducement of Carduco into the dealership acquisition" "improperly assume[d] an element of fraud cause of actions," which "would be an improper comment on the evidence"; (3) "there is no evidence or insufficient evidence to raise a fact issue about any affirmative misrepresentation to Carduco by any of the Defendants"; (4) "[t]here is no evidence or insufficient evidence of the falsity of any representation made by [MBUSA] regarding any right of [Carduco] to relocate its dealership or to have exclusive territorial ... rights"; (5) "there's no evidence of any intent by [MBUSA] to induce Carduco into entering into a contract to purchase the ... Harlingen Autoplex dealership and there was no representation made to Carduco"; (6) "there's no evidence that Carduco actually and justifiably relied on any representation by any of the Defendants"; (7) "[a]ny reliance that has been alleged or attempted to be proved in this case was not justifiable"; (8) that the merger clause instruction was erroneous; (9) "the written documents that have been produced and admitted into evidence gave [MBUSA] the right to put in a competing dealership within Carduco's [AOI], which included McAllen"; (10) the instruction "regarding a false representation by conduct" was a comment on the weight of the evidence and was not raised by the evidence; (11) "when the documents contain no relocation or exclusivity provisions, Carduco is not justified in relying on [MBUSA's] alleged representations" that he could relocate or be the exclusive dealer in the Valley; (12) "there's no evidence of any third-party reliance by Carduco"; (13) "there is no evidence of any injury to" Carduco; (14) question one should include the phrase "actual and justifiable reliance"; (15) "the instruction should include that Carduco actually and justifiably relied on a misrepresentation"; (16) question one should not have included the phrase "signing or closing an agreement" because that "language is not prescribed in the Pattern Jury Charge[ ]"; (17) that question one instructs the jury that deceptive conduct is equivalent to a false statement of fact; (18) the proposed instruction regarding indirect misrepresentation should be included; (19)
*483 "the laundry list of instructions on what constitutes misrepresentation includes forms of misrepresentation that are not raised by the pleadings or the evidence and are not actual under the facts of this case"; (20) "[t]here is no evidence or insufficient evidence of a false statement of fact"; (21) "[t]here's no evidence of a promise of future performance with the intent at the time the promise was made not to perform as promised"; (22) "[t]here is no evidence of a statement of opinion based on a false statement of fact"; (23) "[t]here is no evidence of a statement of opinion that the maker knows to be false"; (24) "there's no evidence of an expression of an opinion that is false made by one with special knowledge"; (25) an instruction regarding a failure to disclose should not be included because there is no evidence of a confidential or special relationship and the Texas Supreme Court has not approved other bases for finding a duty to disclose; (26) "there's no evidence of failure to disclose a material fact"; (27) "there's no evidence that [MBUSA's] failure to disclose the Heller-Bird deal was intended to induce Carduco to buy Cardenas Autoplex"; (28) "there's no evidence of any injury by means of a failure to disclose"; the merger clause instruction "go[es] to the issue of what the bargain actually was and whether [Carduco] actually and justifiably relied on any alleged ... misrepresentation"; and (29) the form of the question should have "a separate question or at least separate line about whether [MBUSA] committed fraud by a failure to disclose, otherwise failure to disclose and affirmative misrepresentation are improperly commingled and it would be impossible to determine for purposes of appeal what the [j]ury actually did find in answering this question." MBUSA objected to question five on the basis that "the failure to separate each ground of liability or potential liability so that the Jury would have to make a finding as to each ground, otherwise theories of liability, fraud, and malice are commingled and it will make it difficult or impossible for the parties to determine the basis on which the Jury makes a finding, if it does, on this question."
2. Discussion
We acknowledge that under Casteel, a party is not required to specifically state that it is making a Casteel objection when it is apparent from the context. See Thota v. Young, 366 S.W.3d 678, 691 (Tex.2012). However, when a party claims that the trial court must submit a granulated question to the jury, that party must make such an objection to the trial court. See ids="7316762" index="38" url="https://cite.case.law/sw3d/366/678/#p691">id. Here, as further explained below, although it is obvious from the context of its objections, MBUSA made Casteel objections to the charge, MBUSA did not specifically object to the charge on the basis it now argues on appeal.
At the charge conference, MBUSA specifically objected "to the form of ... question [one] because there should be a separate question or at least a separate line about whether [MBUSA] committed fraud by a failure to disclose, otherwise failure to disclose and affirmative misrepresentation are improperly commingled and it would be impossible to determine for purposes of appeal what the Jury actually did find in answering this question." As to question five, MBUSA objected "that there is not clear and convincing evidence of either fraud or malice" and that "the failure to separate each ground of liability or potential liability so that the Jury would have to make a finding as to each ground, otherwise the theories of liability, fraud, and malice are commingled and it will make it difficult or impossible for the parties to determine the basis on which the *484 Jury makes a finding, if it does, on this question." MBUSA did not specifically object to the charge on the basis that "[b]ecause questions one and five combined seven independent liability theories against four independent defendants, the judgment can stand only if all 28 permutations are legally valid and supported by sufficient evidence" and that all twenty-eight permutations are not legally valid or supported by sufficient evidence. See Tex. Comm'n on Human Rights v. Morrison, 381 S.W.3d 533, 536 (Tex.2012) ("We require only objections, not correct questions, to preserve Casteel error."); Romero v. KPH Consol., Inc., 166 S.W.3d 212, 228 (Tex.2005) (concluding that appellant had preserved its Casteel complaint). Moreover, MBUSA does not cite the record wherein it objected to the charge on the basis that each definition of misrepresentation and each manner of committing a non-disclosure constitutes a separate theory of liability requiring a separate question under Casteel, and we have found no such objection. Thus, we cannot conclude that MBUSA preserved its appellate argument.
Nonetheless, we agree with Carduco that MBUSA has not met its appellate burden of showing that Casteel is applicable in this case. Generally, common-law fraud constitutes a single theory of liability, and the jury charge here presented a single claim of fraud in the inducement in question one. See Formosa Plastics Corp., USA v. Kajima Int'l, Inc., 216 S.W.3d 436, 455 (Tex.App.-Corpus Christi 2006, pet. denied) (op. on reh'g) (en banc). " Casteel applies to multiple theories of liability; by contrast, the instant situation involves only one-fraud. [And], Casteel does not require a granulated submission as to multiple acts under a single theory of liability." Id. Thus, as a threshold matter, MBUSA must show that each definition of misrepresentation and non-disclosure constitutes a different theory of liability of fraud in the inducement before we can even determine whether Casteel applies. Thus, MBUSA has a burden on appeal to provide authority and substantive analysis explaining this assertion. Here, without citation to authority or any substantive analysis in its appellate brief, MBUSA claims that although question one and question five each included only one single theory of liability, the charge commingled "the nondisclosure theory ... with six other unsupported theories of liability,"[37] which included the following ways to commit fraud in the inducement and fraud by non-disclosure: (1) a "party fails to disclose or actively conceals a material fact within the knowledge of that party"; (2) "the party knows that the other party is ignorant of the fact and does not have equal opportunity to discover the truth"; (3) "the party intends to induce the other party to signing and closing an agreement by failing to disclose the fact"; and (4) "the other party suffers injury as a result of acting without knowledge of the undisclosed fact."[38] However, without substantive analysis or citation to appropriate authority, we are unable to conclude that MBUSA has met it appellate burden of showing that each of the above-described manners of committing fraud by non-disclosure each constitutes a separate theory of liability.[39] For this same reason, *485 we cannot conclude that each definition of misrepresentation constitutes multiple theories of liability. Thus, even assuming that MBUSA preserved its appellate Casteel argument, we cannot conclude that the trial court abused its discretion by overruling such objection.
Moreover, "the error of including a factually unsupported claim in a broad-form jury question is not always reversible" and "to be reversible, the erroneous instruction must have 'probably prevented the appellant from properly presenting the case to the court of appeals.' " Formosa Plastics Corp., USA, 216 S.W.3d at 455 (citing TEX. R. APP. P. 44.1(a)(2) ; Romero, 166 S.W.3d at 227. On appeal, MBUSA neither makes such an argument nor provides any substantive analysis showing that the allegedly erroneous instruction prevented it from properly presenting the case on appeal. We overrule the portion of MBUSA's fourth issue addressing its Casteel argument.
B. Merger Clause Instruction
MBUSA next argues that the merger clause instruction is erroneous because "the instruction falsely suggests that the Dealer Agreement contains only a merger or entire-agreement clause, when, as shown in section II above, the Dealer Agreement also contains a specific promise of no reliance" and "[a]s a matter of law, this promise is effective to prevent a claim for fraud in the inducement." However, we have already concluded that the disclaimer of reliance clause in the Dealer Agreement did not prevent Carduco's claim for fraud in the inducement. Thus, we reject this argument.
Next, MBUSA argues that the merger clause instruction is erroneous because "this pure question of law has no place in the jury instructions" and it is an impermissible comment on the weight of the evidence. MBUSA does not cite the record where it objected to the charge on those grounds. At the charge conference MBUSA only objected to the inclusion of the merger clause instruction on the basis that the Dealer Agreement did not contain a merger clause and instead contained a disclaimer of reliance. MBUSA did not object on the basis that including the merger clause instruction was an impermissible comment on the weight of the evidence or that a pure question of law had no place in the jury instructions. Therefore, MBUSA did not preserve this complaint. We overrule MBUSA's fourth issue to the extent it argues that charge was erroneous because it included the merger clause instruction.
C. Spoliation Instruction
Finally, MBUSA argues in this fourth issue, that the trial court erred by including the spoliation instruction. Specifically, MBUSA complains that "Carduco never identified any evidence that was actually spoliated and Carduco did not show how any allegedly missing evidence prejudiced its case."[40]
*486 MBUSA complains of following instruction:
You, the jury, are instructed that Mercedes-Benz USA destroyed, lost, or failed to produce to this Court certain emails that by law should have been produced as evidence for your deliberations. You may, but are not required to, presume that this evidence, if produced, would have been unfavorable to Mercedes-Benz USA.
1. Applicable Law
A spoliation instruction is appropriate when a party has deliberately destroyed evidence, failed to produce it, or failed to explain the nonproduction. Wal-Mart Stores, Inc. v. Johnson, 106 S.W.3d 718, 721-22 (Tex.2003). We review a trial court's decision to impose a remedy for spoliation of evidence, including a jury instruction, for an abuse of discretion. Brookshire Bros., Ltd. v. Aldridge, 438 S.W.3d 9, 27 (Tex.2014). A court abuses its discretion if its decision is arbitrary and unreasonable or without reference to guiding rules or principles. IQ Holdings, Inc. v. Stewart Title Guar. Co., 451 S.W.3d 861, 867 (Tex.App.-Houston [1st Dist.] 2014, no pet.).
The Texas Supreme Court recently explained that a spoliation analysis involves a two-step process. First, the trial court determines as a question of law whether a party spoliated evidence. Brookshire Bros., 438 S.W.3d at 14. This step requires the trial court to find that the party accused of spoliation (1) had a duty to preserve evidence, and (2) intentionally or negligently breached that duty. Id. If the trial court concludes that a party intentionally[41] spoliated evidence it moves to the second step, which is to determine an appropriate remedy. Id.[42]
Like any discovery sanction, the remedy for spoliation must have "a direct relationship to the act of spoliation and may not be excessive." Id. (citing TransAm. Natural Gas Corp. v. Powell , 811 S.W.2d 913, 917 (Tex.1991) (orig.proceeding) ). "In other words, the remedy crafted by the trial court must be proportionate when weighing the culpability of the spoliating party and the prejudice to the nonspoliating party." Id. The sanction also must not be excessive, meaning that it is no more severe than is necessary to satisfy its legitimate purpose. Petroleum Sols., Inc. v. Head, 454 S.W.3d 482, 489 (Tex.2014). As part of this requirement, the trial court must consider the availability of lesser sanctions and actually test them "in all but the most exceptional cases." Id. (citing Cire v. Cummings, 134 S.W.3d 835, 841 (Tex.2004) ).
2. Discussion
First, MBUSA argues that there is no proof that any relevant emails were destroyed or lost. Carduco points to evidence of the following: MBUSA did not issue a litigation hold when it became aware of the litigation; when Carduco requested production, MBUSA allowed its employees to submit documents they believed were relevant to the litigation; MBUSA did not conduct an electronic search until the trial court ordered one in *487 April 2012; MBUSA admitted the deletion of emails for several of its key former and current employees; and MBUSA admits the deletion of entire mailboxes of former employees who left the company after MBUSA anticipated litigation. Finally, Carduco points to evidence that MBUSA's designated representative, Kelly, testified that several current MBUSA employees no longer had any responsive electronic files or emails despite their direct involvement with these events. And, when Kelly stated that he would answer questions regarding why those emails were deleted at a later time, Kelly failed to appear at trial despite a subpoena. We agree with Carduco that there is evidence that relevant emails were destroyed or lost.
Next, MBUSA argues that the record does not support that it intentionally spoliated evidence. Under Brookshire, "intentional" spoliation means that "the party acted with the subjective purpose of concealing or destroying discoverable evidence."[43] 438 S.W.3d at 24. This includes the concept of willful blindness, "which encompasses the scenario in which a party does not directly destroy evidence known to be relevant and discoverable, but nonetheless allows for its destruction." Id. (internal quotations omitted). MBUSA's argument assumes that Brookshire Brothers required direct evidence of subjective intent, but nothing in that case explicitly imposed such a requirement. See ids="6915104" index="59" url="https://cite.case.law/sw3d/438/9/#p27">id. The Texas Supreme Court has long recognized in fraud cases generally that evidence of intent "is not usually susceptible to direct proof." See Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 305 (Tex.2006) ; see also Ford Motor Co. v. Castillo, 444 S.W.3d 616, 622 (Tex.2014) (per curiam) (observing generally that in fraud cases "[i]t is not often that any kind of evidence but circumstantial evidence can be procured."). We have reviewed the entire record and found that the trial court heard substantial circumstantial evidence from which it could infer that MBUSA acted with the subjective intent to destroy evidence as further explained below.
Mark Kelly, MBUSA's in-house counsel, testified that MBUSA anticipated litigation with Carduco no later than August of 2009, the time when Holt informed Cardenas that MBUSA was opening the McAllen dealership with Heller-Bird motors.[44] However, MBUSA never issued a litigation hold, even when Carduco served MBUSA with requests for production. Instead, MBUSA reached out to individual employees and requested that they submit any responsive documents. MBUSA did not search its electronic database for responsive documents until it was ordered to by the trial court in April of 2012.
MBUSA produced documents from Holt, Newcomb, Dearing, and Oswald, but stated it had no responsive documents from Damon Blakemore, Jaclyn Fedzina, Bob Neis, and Tracey Matura. Notably, all of the people for whom MBUSA possessed no responsive documents were equally involved in the events giving rise to this case as those with documents: Blakemore was MBUSA's field representative to the Harlingen *488 dealership and accompanied Cardenas on the site visit to McAllen; Fedzina was responsible for processing Carduco's franchise application; Bob Neis was the general manager of the region that included Harlingen and responsible for appointing franchisees for that area; and Tracey Matura was one of MBUSA's signatories on the binding letter of intent with Heller Bird Motors to open MBUSA's McAllen dealership. Each of these persons was directly involved with the events giving rise to this case, but MBUSA possessed no responsive document from any of them.
Kelly confirmed that the electronic inboxes of Neis and Fedzina were deleted when they left the company even though both left MBUSA after the company admitted to anticipating litigation with Carduco. Kelly testified that he did not know why their inboxes were deleted but that he thought the deletions were due to the "passage of time." Kelly nevertheless agreed with a question from Carduco's counsel that "an effort was not made to preserve electronically stored evidence with respect to those individuals." Kelly testified that he would investigate the reason for the deletions, but he never appeared to testify at trial despite a subpoena being issued for him.
We also note that the trial court heard direct testimony from Holt that he and other employees destroyed the original version of Dearing's notes from the meeting with Cardenas about his plans to relocate Carduco to McAllen. The admitted purpose of destroying the original version was "to ensure that no conflicting documents existe[d]."
Based on all of the foregoing, whether MBUSA deliberately destroyed documents or knowingly permitted them to be destroyed through the passage of time, there was sufficient evidence in the record to support the trial court's finding that MBUSA intentionally spoliated evidence. See Brookshire Bros., 438 S.W.3d at 24.
Next, MBUSA argues that the record does not support an implied finding that the spoliation instruction was the appropriate sanction because Carduco did not establish prejudice. Factors that we may consider in analyzing prejudice from spoliation of evidence in a specific case include: (1) the relevance of the spoliated evidence to key issues in the case; (2) the harmful effect of the evidence on the spoliating party's case, or, conversely, whether the evidence would have been helpful to the nonspoliating party's case; and (3) whether the spoliated evidence was cumulative of other competent evidence that may be used instead of the spoliated evidence. Id. at 21-22.
MBUSA argues that these factors do not support an instruction in this case because there is no evidence either that MBUSA destroyed relevant evidence or, if the evidence was relevant, that it was cumulative of other evidence in the record. MBUSA points out that it produced emails from Neis from the inboxes of other persons and from all the individual defendants. MBUSA also argues that Carduco never identified a single contested issue of fact on which it lost relevant evidence because of the alleged spoliation.
Regarding the relevance of the spoliated evidence, Carduco provided evidence that no email account was found for Damon Blakemore, Mathew Messerly, and Tracey Matura. Kelly testified that he would have expected that Blakemore would have had emails concerning the Harlingen dealership and that he did not know why none of Blakemore's emails had been found. Kelly testified that Messerly still worked at MBUSA and that Messerly was the field representative for Autoplex Harlingen. Evidence was presented that Neis *489 was in charge of Carduco's dealership application.[45]
Thus, we disagree with MBUSA on the issue of relevance. Each of the persons for whom there were no responsive documents were MBUSA employees directly involved in the events giving rise to this case. As we stated above, Blakemore was MBUSA's field representative to the Harlingen dealership; Matura signed the letter of intent with Heller-Bird Motors; Fedzina processed Carduco's application to become an MBUSA dealer; and Neis would have been involved in deciding whether Carduco could become a dealer. Given their involvement in the facts of the case, the trial court could have reasonably concluded that each of them possessed evidence that would assist Carduco in fully presenting its case to the jury. For example, one of the emails MBUSA did produce is from Holt to Neis in which Holt asks if he should inform Renato that a new point was open in San Juan. Neis responded to "Hold off," but MBUSA produced no other emails from Neis following up on that instruction. MBUSA also initially withheld the Neis/Holt email by claiming attorney-client privilege even though neither Neis nor Holt are attorneys. Most tellingly, Kelly, MBUSA's in-house counsel, specifically agreed during his deposition that relevant documents were lost:
Q. Mr. Kelly, I understand you testified that some employees have left Mercedes-Benz that were previously employed by MBUSA and involved to some extent in my client's acquisition of Autoplex Harlingen and subsequent enfranchisement by MBUSA, correct?"
A. Yes.
Q. That's Bob Neis, Jaclyn Fedzina, Frank Berenz (ph), potential others, correct?
A. Yes.
....
Q. Can you testify that Mercedes-Benz preserved all relevant evidence relating to Carduco's claims in this case at the time that Mercedes-Benz anticipated litigation with Carduco?"
A. No.
Based on all the foregoing, we conclude that the trial court could have reasonably found that those emails were relevant to key issues in this case.
Regarding whether the evidence was cumulative, MBUSA does not cite the record where the emails it produced were shown to contain evidence cumulative of the spoliated evidence. Thus, we cannot conclude that the spoliated evidence was cumulative of other competent evidence that may have been used instead of the spoliated evidence. Moreover, we conclude that the evidence we described above supports a reasonable conclusion by the trial court that the lost evidence was not cumulative but would have further strengthened Carduco's case and harmed MBUSA's. The trial court could have reasonably concluded that the missing evidence may have contained more information concerning MBUSA's "work around" plan to thwart Carduco's business and make Heller-Bird the sole Mercedes-Benz dealership in the Rio Grande Valley. Without this evidence, Carduco was unable to present a full picture of the reasons behind MBUSA's actions to the jury. We reject MBUSA's argument that Carduco did not establish *490 its case was harmed as a result of the spoliation.[46]
Finally, MBUSA argues that the record does not reflect that the trial court considered lesser sanctions. The record must reflect that the trial court considered lesser sanctions to address spoliation of evidence and, "in all but the most exceptional cases," actually tested the lessor sanctions. Petroleum Sols., 454 S.W.3d at 489. Exceptional cases are those when it is "fully apparent that no lesser sanctions would promote compliance with the rules." Cire, 134 S.W.3d at 841.
MBUSA's argument might have merit if we were limited to reviewing only the hearing on Carduco's request for a spoliation instruction, but appellate courts review the entire record to determine if the sanction was appropriate. See Am. Flood Research, Inc. v. Jones, 192 S.W.3d 581, 583 (Tex.2006) (per curiam). The record reflects that the trial court imposed at least one lesser sanction related to spoliation, by granting Carduco's motion to compel the appearance of several MBUSA employees at a deposition in Dallas. The court's order provided that MBUSA would "bear the travel costs in producing said witness[es]" from New Jersey and other locations outside Texas. See TEX. R. CIV. P. 215.2(b)(2) (providing for a sanction for discovery abuse in the form of an order charging all or any portion of the expenses of discovery to the disobedient party).
Moreover, the trial court did not explicitly explain why lesser sanctions would be insufficient to remedy the prejudice Carduco suffered. However, we conclude that it would have been "fully apparent" to the court on this record that no lesser sanctions would sufficiently address the prejudice Carduco suffered. See Cire, 134 S.W.3d at 841. The trial court knew from Carduco's submissions at the hearing that documents from persons intimately involved with the events of the case had been irretrievably destroyed. Without those emails and other documents, Carduco was unable to fully present its case to the jury. In such circumstances, the trial court did not abuse its discretion by concluding that a lesser sanction would be insufficient to remedy the prejudice Carduco suffered from the spoliation. See Brookshire Bros., 438 S.W.3d at 25. We reject MBUSA's final argument, and we overrule MBUSA's fourth issue.
VI. ADMISSION OF INDEMNITY AGREEMENT
By its fifth issue, MBUSA contends that the trial court abused its discretion by admitting evidence that MBUSA agreed to indemnify the individual defendants.
MBUSA argues that the trial court's admission of evidence that MBUSA would indemnify Holt, Dearing, and Oswald "is akin to introducing proof that a defendant is insured." Carduco responds that although MBUSA objected to evidence of the indemnity agreement once on the basis of relevance, MBUSA made no subsequent objections when Carduco provided evidence of the indemnity agreement later. MBUSA does not cite the record where it objected to evidence of indemnification on the basis that such evidence is akin to introducing proof that a defendant is insured. However, Carduco points to several excerpts of the record where it presented evidence of the agreement without objection from MBUSA.
*491 First, on redirect examination, Carduco's trial counsel asked Dearing whether MBUSA was paying for his defense. MBUSA objected as to relevancy, stating, "This issue is not important." Carduco's trial counsel responded that "[i]t goes directly to bias, and they're asking this witness about his being a defendant in a lawsuit. If they're paying for his defense, the jury's entitled to know." The trial court overruled MBUSA's relevancy objection. Dearing testified that MBUSA was paying for his defense. MBUSA did not make any objection on the basis that evidence of indemnification is akin to evidence that the defendant has insurance.
Then, Carduco's trial counsel asked, "If the jury finds against you, Mercedes-Benz is paying any judgment against you; isn't that true?" MBUSA did not object to this question, and Dearing replied, without objection, "I would certainly hope so." Carduco's trial counsel then asked, "Do you agree that Mercedes-Benz has agreed to pay for any judgment that may be rendered against you?" MBUSA did not object to this question on any basis. Dearing replied, without objection, "I believe that to be true."
Next, at a hearing outside the jury's presence, Carduco's trial counsel objected to non-production of MBUSA's indemnification agreements and requested that trial court require MBUSA to immediately produce such agreements. MBUSA responded that there was no evidence of any formal indemnification agreements, such information was not relevant, and "There's been no suggestion that Mercedes is not covering the Defendants' legal expenses or potential judgment. Any documentation is simply going to be duplicate of the evidence that's already been elicited." MBUSA did not object to evidence of the indemnification agreement on the basis that such evidence is akin to introducing proof that a defendant is insured.
Subsequently, during redirect of Oswald, the following exchange occurred:
[Carduco:] Mr. Oswald, just a couple more questions, sir. You also have an agreement with Mercedes-Benz to pay for your defense in this case, right?
[Oswald:] I certainly hope so.
[Carduco:] You have an agreement from Mercedes-Benz to pay for any judgment that may be rendered against you individually, right, sir?
[Oswald:] Yes, sir, I hope so.
[Carduco:] Did you get that agreement in writing?
[Oswald:] No, I did not.
[Carduco:] You're taking Mercedes-Benz's at its word?
[Oswald:] I have an e-mail that states that.
[Carduco:] Are you holding onto it?
[Oswald:] You better believe it.
MBUSA made no objections. Accordingly, we agree with Carduco and conclude that MBUSA did not preserve its complaint that evidence of the indemnity agreement was akin to proving that the defendant had insurance. We overrule MBUSA's fifth issue.
VII. Jury Argument
By its sixth issue, MBUSA contends that the trial court erroneously overruled a timely objection to the failure of Carduco's trial counsel to fully open the jury argument. Specifically, MBUSA argues that Carduco's trial counsel violated rule 269(b) of the Texas Rules of Civil Procedure because the trial court allowed Carduco's trial counsel to present argument to the jury on the jury charge and punitive damages in rebuttal when counsel failed to fully open by addressing these *492 issues in his initial argument. See TEX. R. CIV. P. 269(b).
MBUSA states that when Carduco's trial counsel completed the opening portion of his argument, he did not review the jury charge or mention punitive damages. Prior to its own argument, MBUSA objected and asked the trial court to require that Carduco fully open or be prohibited from discussing new issues in concluding argument. According to MBUSA, after hearing argument from Carduco that MBUSA should have objected on that basis before its trial counsel began his argument, the trial court overruled MBUSA's objection and allowed Carduco's trial counsel "for the first time" during final argument to ask "the jury to award huge sums of punitive damages."
Rule 269(b) states, "In all arguments, and especially in arguments on the trial of the case, the counsel opening shall present his whole case as he relies on it, both of law and facts, and shall be heard in the concluding argument only in reply to the counsel on the other side." Id. MBUSA's trial counsel, prior to Carduco's rebuttal argued that Carduco wanted to punish MBUSA and argued against awarding punitive damages. In addition, MBUSA's trial counsel reviewed the jury charge questions with the jury and made arguments against answering those questions in favor of Carduco. Although rule 269(b) states that the counsel opening shall present his whole case, it also states that the counsel opening "shall be heard in the concluding argument only In reply to the counsel on the other side." See Id. (emphasis added). Thus, because MBUSA's trial counsel presented argument concerning the jury charge and argued against awarding punitive damages to Carduco, we cannot conclude that the trial court abused its discretion when it allowed Carduco's trial counsel to reply to those arguments by arguing that the jury should award punitive damages and to reply to MBUSA's review of the jury charge.See Id. Accordingly, we overrule MBUSA's sixth issue to the extent that it argues that Carduco's trial counsel violated rule 269(b).[47]
VIII. PUNITIVE DAMAGES
A. Sufficiency of the Evidence for Punitive Damages
By its seventh issue, MBUSA contends that the evidence does not support the jury's punitive damages awards because there is no evidence of fraud or malice. MBUSA argues that "Holt never said anything to Carduco before it acquired the Harlingen dealership; Renato admitted that Dearing and Oswald never said anything about whether or not Carduco could relocate to McAllen (much less something false); and Carduco neither proved nor obtained a finding that any other MBUSA agent committed fraud attributable to the company."
However, as previously explained, the jury heard evidence that Holt had already approved the Harlingen dealership's move to McAllen, Holt was aware that Renato planned on moving the dealership to McAllen, and MBUSA planned to add the Heller-Bird dealership in hopes of negatively affecting the Harlingen dealership's business in hopes of terminating the Harlingen dealership so that Heller-Bird remained the sole Mercedes-Benz dealership in the Valley. Moreover, the evidence supports a finding that when MBUSA entered the Dealer Agreement it had no *493 intention of performing its end of the bargain because instead MBUSA planned on "working around" the buy/sell agreement by causing Carduco harm. See Aquaplex, Inc., 297 S.W.3d at 774 ("A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made."). Thus, we have already concluded that the evidence supports the jury's finding of fraud for several reasons already explained. In addition, the same evidence supports a conclusion that MBUSA had a specific intent to cause substantial injury or harm to Carduco. Thus, we conclude that there is clear and convincing evidence supporting the jury's finding of malice and fraud. See TEX. CIV. PRAC. & REM. CODE § 41.003 (West, Westlaw through 2015 R.S.) (authorizing exemplary damages only with clear and convincing evidence that harm resulted from fraud, malice, or gross negligence). We overrule MBUSA's seventh issue.[48]
B. Amount of Punitive Damages
By its ninth issue, MBUSA contends that the punitive damages award is excessive and unconstitutional because the "$115 million award is more than seven times the very substantial compensatory damages award of $15.3 million and almost 3,000 times the maximum combined Penal Code fine of $40,000 available against four defendants for analogous jury findings."
1. Applicable Law
Punitive damages are constitutionally valid in order to further the State's legitimate interests in punishing unlawful conduct and deterring its repetition. BMW of N. Am. v. Gore, 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). However, when an award of punitive damages is grossly excessive, no legitimate state interest is served and the award constitutes an arbitrary deprivation of property. State Farm Mutual Auto. Ins. Co. v. Campbell, 538 U.S. 408, 417, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). In reviewing the constitutionality of the amount of punitive damages, we are guided by the following considerations: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio of punitive damages to compensatory damages awarded; and (3) the difference between the punitive damages awarded by the jury and penalties authorized or imposed in similar cases. State Farm, 538 U.S. at 418, 123 S.Ct. 1513 ; Gore, 517 U.S. at 574-80, 116 S.Ct. 1589. We review the constitutionality of the award of punitive damages de novo. Tony Gullo Motors I, L.P., 212 S.W.3d at 307 (stating that "the constitutionality of exemplary damages is a legal question for the court" and noting that the Supreme Court required "de novo appellate review of exemplary damages because "the level of punitive damages is not really a 'fact' 'tried' by the jury' ") (citing and *494 quoting Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 436-37, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) ).
The reprehensibility of the defendant's conduct, which is the "most important indicium of the reasonableness" of punitive damage awards, is measured by five nonexclusive factors: (1) the harm inflicted was physical rather than economic; (2) the tortious conduct showed an indifference to or reckless disregard for the health or safety of others; (3) the target of the conduct was financially vulnerable; (4) the conduct involved repeated actions and was not just an isolated incident; and (5) the harm did not result from mere accident and instead resulted from intentional malice, trickery, or deceit. Bennett v. Reynolds, 315 S.W.3d 867, 873 (Tex.2010).
2. Analysis
Here, we agree with MBUSA that its conduct: (1) caused purely economic harm rather than physical harm; (2) did not threaten the health or safety of others; and (3) did not involve repeated acts rather than an isolated incident. Therefore, factors one, two, and four weigh completely in favor of MBUSA.
Concerning factor three, Carduco claims it was financially vulnerable because MBUSA plotted "to put Carduco into such financial straits that it would be forced to sell to a dealer more to [MBUSA's] liking." Although we agree with Carduco that MBUSA's acts as found by the jury were unscrupulous, we cannot conclude that Carduco was financially vulnerable because the record simply does not support such a finding. Thus, the third factor weighs heavily in favor of MBUSA. In summary, we find that factors one, two, and four of the reprehensibility guideposts all weigh completely in favor of MBUSA, and factor three heavily weighs in favor of MBSUA. This leaves the fifth factor: whether the harm resulted from mere accident or intentional malice. Assuming without deciding that the fifth factor favors Carduco, the five factors combined still indicate a low level of reprehensibility. See State Farm, 538 U.S. at 419, 123 S.Ct. 1513 (observing that a single factor is not usually sufficient to warrant an award of punitive damages).
We next turn to the second guidepost in reviewing the constitutionality of punitive damages: comparing the ratio of punitive damages to compensatory damages awarded. See ids="9030875" index="90" url="https://cite.case.law/us/538/408/#p417">id. at 418, 123 S.Ct. 1513. Carduco was awarded $15.3 million in compensatory damages but was awarded $115 million in punitive damages. This is approximately a 7.5:1 ratio of punitive to compensatory damages. The Texas Supreme Court has held that a 4:1 ratio "may be close to the line ... of constitutional impropriety." See Bennett, 315 S.W.3d at 873. Therefore, we find that the ratio in the present case weighs in favor of finding the punitive damages excessive.
Last, we address the third guidepost: the difference between punitive damages awarded and penalties authorized or imposed in similar cases. See State Farm, 538 U.S. at 418, 123 S.Ct. 1513. "This factor fortifies the notion that legislatures make policy and are well positioned to define and deter undesired behavior." Bennett, 315 S.W.3d at 880. Courts can look to both civil and criminal statutes to find comparable punishments. See ids="7326062" index="96" url="https://cite.case.law/sw3d/315/867/#p873">id. at 873. In Bennett , the jury found the defendants' conduct was deceitful and awarded heavy punitive damages, with an approximate 235:1 punitive to compensatory damages ratio. Id. at 873. The Texas Supreme Court in Bennett found the punitive damages awarded to be unconstitutionally excessive and thus remanded the case to the Austin court of appeal to reconsider *495 the punitive damages in light of the "prevailing ratio analysis." Id. at 885. On remand, the Austin Court of Appeals analyzed similar criminal statutes; specifically, it noted that under the Texas Penal Code, a third-degree felony for securing a signature by deception (which is similar in nature to the fraud committed in our present case) warrants a maximum fine of $10,000. See Bennett v. Reynolds, No. 03-05-00034-CV, 2010 WL 4670270, at *5 (Tex.App.-Austin Nov. 18, 2010, no pet.) (mem. op. on remand); see also TEX. PEN. CODE ANN. § 12.34 (West, Westlaw through 2015 R.S.). The court also recognized that only one of the five reprehensibility factors was present: the conduct was a result of deceit, trickery, or malice. See Bennett, 2010 WL 4670270, at *5. Accordingly, based on the relatively low level of reprehensibility and deferring to the penal code, the court held that "due process permits exemplary damages awards against Bennett and Bonham Corporation of not greater than $10,000 each." Id.
The Fort Worth Court of Appeals has also recently faced the task of assessing the constitutionality of exemplary damages. See Acadia Healthcare Co., Inc. v. Horizon Health Corp., 472 S.W.3d 74, 97 (Tex.App.-Fort Worth 2015, pet. filed). That case dealt with trade secrets, and the court noted that similar criminal statutes warranted a maximum fine of $10,000. Id. However, finding that two of the reprehensibility factors were present, the court of appeals suggested a remittitur to reduce the punitive damages to $220,196.96 against each defendant. Id.
Reviewing the three guideposts, we find that the punitive damages awarded in this case ($115 million) are unconstitutionally excessive. See Bennett, 315 S.W.3d at 880. This is especially true since, as stated above, reprehensibility of the conduct involved is the most important factor, see id., but the defendants' conduct in the present case is not "particularly egregious." Id. at 878. We found that three of the factors weigh completely in the defendants' favor, one weighs mostly in their favor, and only one factor may actually support a reprehensibility finding. Additionally, the punitive damages far exceed the amount of compensatory damages awarded, and the punitive damages far exceed the penalties authorized in similar criminal statues and in similar cases. See ids="7326062" index="108" url="https://cite.case.law/sw3d/315/867/#p873">id. at 880. We must conclude that the punitive damages are grossly excessive and out of proportion to the severity of the offense. See State Farm, 538 U.S. at 418, 123 S.Ct. 1513.
However, we note that there is no "mathematical bright line" in determining the exact amount of punitive damages to appropriately award. See Bennett, 315 S.W.3d at 873. Recognizing the relatively low level of reprehensibility but giving deference to the jury's finding of malice and fraud, keeping in mind the comparative criminal statute, and noting the approaches taken by the Austin and Fort Worth court of appeals, we suggest a remittitur of an amount to reduce the total punitive damages to $600,000. See State Farm, 538 U.S. at 418, 123 S.Ct. 1513 ; Bennett, 315 S.W.3d at 870-80 ; Acadia Healthcare, 472 S.W.3d at 90-97 ; Bennett, 2010 WL 4670270, at *5 ; see also TEX. PEN. CODE ANN. § 12.34.
IX. CONCLUSION
Accordingly, we affirm the trial court's judgment conditioned on Carduco's filing the remittitur reducing the total punitive damages to $600,000. If Carduco files this remittitur with the trial court clerk within thirty days of this opinion and notifies this court of such, we will reform this portion *496 of the trial court's judgment and, as reformed, affirm the exemplary-damage award; otherwise, we will reverse portions of the trial court's judgment. See TEX. R. APP. P. 46.3 ; TEX. R. CIV. P. 315.
DISSENTING MEMORANDUM OPINION
Dissenting Memorandum Opinion by Justice Rodriguez
I respectfully dissent and would reverse and render a decision that Carduco, Inc. d/b/a Cardenas Metroplex take nothing on its fraudulent inducement and negligent representation claims because I would conclude that the alleged oral representations and non-disclosures about which Carduco complains are directly contradicted by the express, unambiguous terms of the Dealer Agreement, and Carduco was not justified in relying upon them as a matter of law.
By their first issue, appellants challenge, as a matter of law, the reliance element of Carduco's fraudulent inducement and negligent misrepresentation claims, including any claim based on a non-disclosure theory. Appellants contend that Carduco could not justifiably rely on alleged misrepresentations that its bargain with MBUSA included the right to relocate and to enjoy exclusivity because any such representations were in conflict with the clear terms of the contract. Appellants assert that certain provisions in the Dealer Agreement preclude any claim that Carduco's bargain was to operate as the exclusive new Mercedes-Benz dealership in the region or that it was to construct a facility in McAllen, Texas.
Causes of action for fraudulent inducement and negligent misrepresentation require proof of reliance. Miller Global Props., LLC v. Marriott Int'l, Inc. , 418 S.W.3d 342, 347 (Tex.App.-Dallas 2013, pet. denied) (citing Haase v. Glazner, 62 S.W.3d 795, 798 (Tex.2001) ; Fed. Land Bank Ass'n of Tyler v. Sloane, 825 S.W.2d 439, 442 (Tex.1991) ). "[R]eliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law." Playboy Enters., Inc. v. Editorial Caballero, S.A. de C.V. , 202 S.W.3d 250, 258 (Tex.App.-Corpus Christi 2006, pet. denied) ; see DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A. , 112 S.W.3d 854, 858 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (op. on reh'g en banc) (setting out that in order to negate justifiable reliance in this way, the extra-contractual misrepresentation must be "directly contradicted by the express, unambiguous terms of a written agreement between the parties"). I would also apply these principles to fraud claims based on alleged non-disclosures because reliance is also an element of fraud by non-disclosure or fraud by omission. See Horizon Shipbuilding, Inc. v. Blyn II Holding, LLC , 324 S.W.3d 840, 850 (Tex.App.-Houston [14th Dist.] 2010, no pet.) (setting out the elements of fraud by non-disclosure or fraud by omission as: (1) the defendant failed to disclose facts to the plaintiff when the defendant had a duty to disclose such facts; (2) the facts were material; (3) the defendant knew of the facts; (4) the defendant knew that the plaintiff was ignorant of the facts and did not have an equal opportunity to discover the truth; (5) the defendant was deliberately silent and failed to disclose the facts with the intent to induce the plaintiff to take some action; (6) the plaintiff relied on the omission ; and (7) the plaintiff suffered injury as a result) (emphasis added).
Appellants direct this Court to the following terms of the Dealer Agreement that they assert conflict with Carduco's claims of misrepresentation and non-disclosure.[1]
*497 Dealer ... understands that its appointment as a Dealer (i) does not grant it an exclusive right to sell Mercedes-Benz Passenger Car Products in its Area of Influence [AOI] or any other geographic area....
...
Unless otherwise provided in the Dealer AOI Space Analysis Addendum, MBUSA hereby approves the location(s) of the Dealership Facilities identified in the Final Paragraph for the exclusive purpose of: (i) showroom and sales facility for Mercedes-Benz Passenger Cars; (ii) service and parts facility for Mercedes-Benz Passenger Cars; (iii) facilities for display and sale of pre-owned Mercedes-Benz vehicles; and (iv) if applicable, other facilities for such other purpose(s) as may be identified in the Final Paragraph.... Dealer shall not move, relocate or change the designated usage of function of the Approved Location(s) or any of the Dealership Facilities without the prior written consent of MBUSA....
The final paragraph of the Dealer Agreement identified "111 South Loop 499[,] Harlingen, TX 78550" as the location of the showroom and sales facility for Mercedes-Benz passenger cars, the service and parts facility for Mercedes-Benz passenger cars, and the display and sales facility for pre-owned Mercedes-Benz vehicles. Finally, appellants direct this Court to the following two terms from the Standard Provisions document that was incorporated into the Dealer Agreement: "MBUSA may add new dealers to or relocate dealers into Dealer's AOI," and "Dealer shall conduct its Dealership Operations only from the Approved Location(s)."
In response, Carduco argues that "these provisions about needing permission to relocate from the original Harlingen location do not directly and unambiguously contradict the representation that Mercedes would grant that permission once a McAllen site was chosen." Carduco identifies the following alleged misrepresentations and non-disclosures, which it asserts form the basis of its claims: "(1) that it could move to McAllen; (2) instructing Carduco to draw up plans for both Harlingen and McAllen; (3) sharing Mercedes documents indicating that the Harlingen-McAllen region could only support one dealership ...; but (4) failing to disclose the new dealer that would definitively block such a move." Carduco directs this Court to, among other things, trial exhibits detailing email communications between MBUSA's employees regarding alleged non-disclosures and misrepresentations made to Carduco. For example, on September 18, 2008, Frank Oswald, the Service and Parts Operations Manager for MBUSA Central Region, emailed Robert Neis regarding a call he received from Robert Chappell, the sales manager at Cardenas Autoplex in McAllen. Oswald informed Neis that he was "planning on visiting Harlingen next Tuesday and Wednesday" and was going "to meet with Rene Cardenas and his [f]ather on Tuesday." He "need[ed] to be prepared for more questions." Oswald asked Neis "[w]hat c[ould] and c[ould] not be said about any future plans there?" Apparently, Andrew Noye, who was copied on the email, forwarded it to Holt. By return email, Holt advised Noye that he would "call Frank and advise him to basically be honest and tell the dealer he is not aware of plans but that these issues are not always handled with Market Team involvement." A follow-up September 19, 2008 email from Holt to all email recipients informed them that he "[s]poke to Frank Oswald" and that "he will inform the dealer *498 that he is not aware of decisions being made by MBUSA in his direction." On September 29, 2008, Holt emailed Neis the following:
Home Office has now received the signed LOI [Letter of Intent] back from Bill Bird and Ron Heller concerning the McAllen open point. The next step is to notify the affected parties. I spoke to FN and specifically asked him "when should we notify Rene and Renaldo Cardenas of a new point in McAllen"? He stated that upon your OK we can proceed. This could affect the buy/sell between Rene and his father. If you think that now is the appropriate time to release this information I will review with Mark Kelly and our outside legal coun[sel] Buddy Ferguson. If all parties agree I will pursue and follow appropriate notification procedures. I think FN and myself will travel to Harlingen and personally let them know of our intentions.
And on September 29, 2008, Neis responded, "Hold off, Hold off ... do not do anything ...... lets [sic] talk...... Repeat. .... do nothing..... hold off ......we can discuss options tomorrow ...... I will be in the office tomorrow ...... BN [Neiss]."
Appellants argue that these alleged misrepresentations and non-disclosures address Carduco's right to relocate upon acquiring the assets and the right to regional exclusivity. They claim that Carduco could not rely on MBUSA's challenged representations and non-disclosures because they are directly contradicted by the express terms of the parties' written agreement. I agree with appellants.
The Dealer Agreement specified that the only approved location for the Carduco facilities was 111 South Loop 499, Harlingen, TX 78550. Through the Dealer Agreement, Mercedes-Benz approved this Harlingen location. It approved no other location. The Dealer Agreement set out that Carduco "shall not move, relocate or change the designated usage or function of the Approved Location(s) or any of the Dealership Facilities without the prior written consent of MBUSA." The Standard Provisions, which Carduco signed and which the Dealer Agreement incorporated, provided that Carduco "shall conduct its Dealership Operations only from the Approved Location(s)." And by its signature, Carduco represented that it understood "that its appointment as a Dealer (i) d[id] not grant it an exclusive right to sell Mercedes-Benz Passenger Car Products in its Area of Influence [AOI] or any other geographic area." Carduco further acknowledged "MBUSA may add new dealers or relocate dealers into Dealer's AOI."
I would conclude that these provisions from the Dealer Agreement directly conflict with any oral representations or non-disclosures regarding appellants' consent or any future consent for Carduco to relocate or to regional exclusivity. I do not believe that Carduco could have justifiably relied on what appellants communicated or failed to communicate as a matter of law because those alleged misrepresentations and non-disclosures were directly contradicted by the express, unambiguous terms of the written agreement between the parties.
Unlike the majority, I would conclude that this Court's opinion in Playboy is indistinguishable on this issue. See 202 S.W.3d at 257-58. Like Carduco, the Playboy plaintiffs claimed to have relied on representations relating to issues that were specifically addressed in a written contract and directly contradicted by the contract.See id. For example, the Playboy plaintiffs claimed to have relied on an oral representation that it could import the Spanish language magazines into the United *499 States, even though the contract provided "[d]istribution and sale of the Foreign Edition in any country other than Mexico will be subject to [Playboy's] prior written approval...." Id. at 258. Instead of holding that the possibility of future written approval saved the plaintiffs' claim, we held that the alleged right to distribute in the United States was "directly contradicted by the express, unambiguous terms of the License Agreement." Id. The Playboy plaintiffs also claimed to have relied on a promise that Playboy would not enforce or terminate the license agreement. Id. Yet the written contract provided that in the event of default, "the non-defaulting party may terminate the [l]icense by written notice to the party in default." Id. Because the written contract gave Playboy discretion to act inconsistently with the alleged extra-contractual representation, we again held that the representation was directly contradicted by the contract. Id.
This Court rejected the plaintiffs' claims in Playboy because the complained-of oral representations were "directly contradicted by the express, unambiguous terms of the [contract]," and so the plaintiffs were "not justified in relying upon them as a matter of law." Id. at 258. We explained that
a party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party. Therefore, reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law.
Id. at 257-58 (quoting DRC Parts & Accessories, 112 S.W.3d at 859 ). I would conclude that this same reasoning applies in this case.
Because the Dealer Agreement expressly allows dealers to move or relocate only with the prior written consent of MBUSA and because the Dealer Agreement allows MBUSA to add new dealers to or relocate dealers into Carduco's AOI, I would determine that it directly contradicts any alleged representation-either by an oral promise or a non-disclosure-that MBUSA would approve Carduco's future relocation requests or that it would allow Carduco to be the exclusive Mercedes-Benz dealer in its AOI. A party "is not rewarded with a claim for fraudulent inducement[, or negligent misrepresentation,] when the other party seeks to invoke its rights under the contract." DRC Parts & Accessories, 112 S.W.3d at 859.
I disagree with the majority's reasoning "that because the jury was not instructed that it was limited to finding fraud only if it determined that [appellants] either (1) told Carduco that it could move to McAllen or (2) failed to tell Carduco that it would not be the exclusive dealership in its AOI[,] ... it was free to come to its own conclusion concerning what [appellants] misrepresented or failed to disclose to Carduco based on the evidence presented at trial." Unlike the majority, I believe that even without such a limitation, the evidence presented at trial upon which the jury could have made its determinations regarding any misrepresentations or non-disclosures did, in fact, relate to the move or to the exclusivity of the dealership in the AOI. So I would conclude that all misrepresentations and non-disclosures about which Carduco complains are directly contradicted by the express, unambiguous terms of the Dealer Agreement and are barred on that basis. Determining that Carduco was not justified in relying upon them as a matter of law, I would sustain appellants' first issue.[2]
*500 With the above analysis, I would conclude that Carduco's fraud in the inducement and negligent misrepresentation claims based on the representations and nondisclosures regarding any relocation or any exclusivity are barred, and I would reverse and render judgment that Carduco, Inc. d/b/a Cardenas Metroplex take nothing on its fraudulent inducement and negligent representation claims.
Accordingly, I respectfully dissent.
SUPPLEMENTAL MEMORANDUM OPINION
Supplemental Memorandum Opinion by Chief Justice Valdez
On March 31, 2016, this Court in our majority opinion suggested a remittitur of $600,000 of the punitive damages awarded to appellee, Carduco, Inc. d/b/a Cardenas Metroplex ("Carduco") pursuant to Carduco's claim of fraud against appellants, Mercedes-Benz USA, LLC; Jack L. Holt, a Mercedes Regional Franchise Manager; Craig W. Dearing, a Mercedes After-Sales Operations Manager; and Frank J. Oswald Jr., a Mercedes After-Sales Operations Manager, (collectively "MBUSA"). We stated that if Carduco filed the remittitur with the trial court clerk within thirty days of our opinion and notified this Court of such, we would affirm the trial court's punitive damages findings in accordance with the remittitur, thereby obviating the need for a new trial. See TEX. R. APP. P . 46.5 ; Bos v. Smith , 492 S.W.3d 361, 394 (Tex. App.-Corpus Christi 2016, pet. filed) (citing Military Highway Water Supply Corp. v. Morin , 114 S.W.3d 728, 741 (Tex. App.-Corpus Christi 2003), as supplemented (Sept. 11, 2003), rev'd on other grounds , 156 S.W.3d 569 (Tex. 2005) ).
Subsequently, Carduco filed a motion for rehearing with this Court requesting for us to determine that it was entitled to the $115,000,000 of punitive damages awarded by the jury. On August 4, 2016, we denied Carduco's motion for rehearing.
On August 19, 2016, Carduco filed its response regarding remittitur of judgment in the amount suggested by this Court showing that it had timely filed the remittitur with the trial court clerk. Accordingly, we vacate our judgment, but not our opinion, dated March 31, 2016, and in accordance with our opinion, we modify the trial court's judgment to the extent of the amount hereby remitted by Carduco so that the amount of the judgment for punitive damages against Mercedes is reduced to the sum of $600,000. See TEX. R. APP. P . 46.3. The judgment of the trial court is affirmed as modified. This Court's majority opinion of March 31, 2016, otherwise remains in effect.

By a sub-issue to the third issue, MBUSA states, "Alternatively, for all of the reasons set forth above, the evidence is factually insufficient to sustain the jury's liability findings against each defendant, and the Court should remand for a new trial." This is the extent of MBUSA's argument. MBUSA has not explained how the cited evidence is so contrary to the overwhelming weight of the legally sufficient evidence as to make the verdict clearly wrong and unjust. See Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex.2003) (explaining that in order for this Court to properly apply our factual sufficiency review, when reversing on the basis of factual insufficiency, we must in our opinions, "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict"). And, "when reversing a trial court's judgment for factual insufficiency, [we] must detail all the evidence relevant to the issue and clearly state why the jury's finding is factually insufficient or so against the great weight and preponderance of the evidence that it is manifestly unjust[, and] [t]he court of appeals must explain how the contrary evidence greatly outweighs the evidence supporting the verdict."Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex.1998). However, without guidance from MBUSA, we decline to independently make such a finding.

Renato C. Cardenas, Sr., Autoplex Harlingen a/k/a Cardenas Autoplex, Inc. Harlingen, Renato G. Cardenas, Heller-Bird Motors, Ron Heller, and Bill Bird were not parties to this lawsuit.

In support of its argument that the jury could have only found that MBUSA committed fraud by making the above alleged misrepresentations or nondisclosures, it cites Carduco's pleading, which stated, "Defendants have intentionally misled Carduco into believing that its bargain with MBUSA was for Carduco to construct an Autohaus facility in McAllen, Texas and operate as the exclusive new Mercedes-Benz dealership in the region upon acquiring Autoplex Harlingen's assets." However, the jury was not told that it was limited to the pleadings; and if the evidence supports any reason for the jury to have found that MBUSA committed fraud in this case that MBUSA has not challenged, then MBUSA is not entitled to a rendition of judgment based on Playboy.

MBUSA does not challenge the legal sufficiency of the evidence supporting the specific elements of fraud in this issue.

The jury could have found that Carduco's trial counsel impeached Holt's credibility by showing that he made statements at his deposition that were inconsistent with his trial testimony and by showing that Holt made "corrections" to his deposition testimony on the basis that he did not understand questions that appeared to be simple.

Newcomb testified that the buy/sell agreement "turned out to be not a sham."

MBUSA conceded that Blakemore's email account had been deleted. This is the sole email MBUSA produced from Blakemore, as it was found in Holt's account.

The jury could have found that Carduco's trial counsel impeached Newcomb's credibility by, among other things, getting Newcomb to admit at trial that his answers to certain questions regarding why he believed the buy/sell was a sham had changed since his deposition. Carduco's trial counsel showed that when asked at his deposition if he believed that the buy/sell was a sham because Rene was selling Autoplex to his father, Newcomb replied, "No" and that at trial, Newcomb stated that one of the reasons he believed a sham had been perpetrated was because Rene was selling Autoplex to his father.

As explained further below, MBUSA had deleted all of Matura's emails and was unable to produce them for trial.

Heller-Bird did not sign this version of the letter of intent.

Oswald said that although he took notes at the meeting, he was unable to find them.

MBUSA witnesses testified that the term "open point" refers to an area where a dealership may be opened. Dearing testified that just because an open point exists does not mean that a new dealership will actually be placed in that open point.

Dearing lived in Flower Mound, Texas at the time. Dearing testified that he had an office in Chicago.

Mission is located west of McAllen.

MBUSA was unable to produce Neis's emails to Carduco. Based on that failure, among other things, the trial court granted Carduco's request for a spoliation instruction in the jury charge.

During its opening statement, MBUSA argued that it planned on allowing Heller-Bird to open its dealership in McAllen in order to stimulate competition so that more people in the area would buy vehicles from both Carduco and Heller-Bird instead of leaving the area to buy Mercedes-Benz vehicles. However, the jury was free to disbelieve MBUSA's evidence that supported such a finding.See City of Keller v. Wilson, 168 S.W.3d 802, 819 (Tex.2005) ("Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another. Reviewing courts cannot impose their own opinions to the contrary.").

We acknowledge that MBUSA believes that because there is no evidence that Carduco had received prior written approval to move to McAllen, this case falls squarely within Playboy. However, here, the evidence supports a finding that it was MBUSA that asked Rene to move Autoplex to McAllen, and according to Holt, the move had been approved. The contract stated, that the dealer could not move or relocate without the prior written consent from Mercedes-Benz. However, Carduco had not yet moved, and there is no evidence that MBUSA could not supply such written approval upon site approval. Thus, we do not agree that this clause directly contradicts, MBUSA's alleged misrepresentation that Carduco could move to McAllen.
We also conclude that because the procedure regarding how a dealer acquires prior written approval to move or relocate was a question for the jury to determine based on the evidence provided.

Carduco claimed that MBUSA destroyed Bob Neis's and Damon Blakemon's emails.

MBUSA contends that the trial court abused its discretion by providing this instruction, an issue we do not reach. See Brookshire Brothers, Ltd. v. Aldridge, 438 S.W.3d 9, 23-26 (Tex.2014) (providing that trial court must find that spoliation of evidence was intentional or due to willful blindness before it is allowed to provide spoliation instruction).

Oswald agreed with Carduco's trial counsel that the parts and services sales in Harlingen did decline after Heller-Bird opened its dealership.

Rene testified, "There was never a question about [whether Carduco] was being allowed to move to McAllen. It was about would these sites be approved."

Oswald testified that opening the new dealership in McAllen would "probably" cause a decline "at first" in parts and services sales in the Harlingen dealership. Oswald stated that these sales "always" decline "[a]nytime a new dealer goes in, the other dealers in the surrounding areas are affected right at first."

Although the dealer agreement states Carduco did not have the right to exclusivity in its AOI, the agreement does not allow MBUSA to open a new dealership in Carduco's AOI to cause Carduco to fail.

In its charge, the trial court instructed the jury that "[a] false representation by conduct can be established by proof of acts alone or by proof of a combination of conduct and concealment of conduct and words" and that a misrepresentation means, among other things, that "[a] promise of future performance made with an intent, at the time the promise was made, not to perform as promised."

Chappell called Oswald on September 18, 2008. On September 19, 2008, Holt instructed Oswald to tell Chappell that he was not aware of decisions by MBUSA regarding the McAllen area dealership. On that same day, MBUSA sent Heller-Bird the letter of intent, which was signed by Ron Heller on September 23, 2008.

Newcomb agreed that MBUSA did not believe it was misleading for Oswald to be untruthful about the new dealership so long as Oswald was unaware of the truth.

Again, given that we must view the evidence in the light most favorable to the jury's verdict, there is more than a scintilla of evidence as previously discussed to support the jury's implied finding that MBUSA intended for Carduco to fail in order to allow Heller-Bird to purchase it and shut it down.

During questioning from his trial counsel, Holt clarified that the protest right did not exist in this case because the Heller-Bird dealership was more than fifteen miles away from Harlingen. However, the jury was free to believe Holt's earlier agreement that Carduco could have protested the Heller-Bird dealership, if it had known. Moreover, there was evidence that Carduco had protested the opening of the Heller-Bird dealership in San Juan.

MBUSA does not provide any argument that Playboy applies to any other alleged misrepresentations or non-disclosures that the jury may have found occurred.

Termination of a car dealer's franchise is governed by section 2301.453 of the Texas Occupations Code, which states the following:
(a) Notwithstanding the terms of any franchise, a manufacturer, distributor, or representative may not terminate or discontinue a franchise with a franchised dealer or directly or indirectly force or attempt to force a franchised dealer to relocate or discontinue a line-make or parts or products related to that line-make unless the manufacturer, distributor, or representative provides notice of the termination or discontinuance as required by Subsection (c) and:
(1) the manufacturer, distributor, or representative receives the dealer's informed written consent;
(2) the appropriate time for the dealer to file a protest under Subsection (e) has expired; or
(3) the board makes a determination of good cause under Subsection (g).
(b) A termination or discontinuance to which this section applies includes a termination or discontinuance of a franchise that results from a change by a manufacturer, distributor, or representative of its:
(1) distributor;
(2) method of distribution of its products in this state; or
(3) business structure or ownership.
Tex. Occ. Code Ann. § 2301.453 (West, Westlaw through 2015 R.S.).

It is undisputed that had MBUSA exercised its right of first refusal under the standard provisions of the contract, it would have been in contravention of Texas law. Thus, if MBUSA's interpretation of the contractual terms contravenes Texas law, we should not use these terms to validate MBUSA's representations or non-disclosures that the jury may have found amounted to fraud.

This separate document had been incorporated by reference into the Dealer Agreement signed by Renato.

In this case, the earlier representations were that MBUSA intended to allow Carduco to become a Mercedes-Benz franchise when in fact MBUSA sought to "work around" the buy/sell and terminate the dealer agreement by allowing Heller-Bird to open in Carduco's AOI and hopefully destroy Carduco's business so that Renato would sell Carduco to Heller-Bird and Heller-Bird would then close Carduco, leaving only one Mercedes-Benz dealership in the Valley.

MBUSA argues by a sub-issue that the five possible definitions of misrepresentation given to the jury all require that each defendant affirmatively communicated something false to Carduco and that there is no such evidence. However, the jury was also instructed as follows:
Fraud in the inducement also occurs when-
a. a party fails to disclose or actively conceals a material fact within the knowledge of that party
b. the party knows that the other party is ignorant of the fact and does not have equal opportunity to discover the truth,
c. the part intends to induce the other party to signing and closing the agreement by failing to disclose the fact, and
d. the other party suffers injury as a result of acting without knowledge of the undisclosed fact.
Thus, the jury was instructed that it could determine that Carduco's fraud in the inducement claim was based on non-disclosures as opposed to misrepresentations. We also note that the jury was instructed that "a false representation by conduct can be established by proof of acts alone or by proof of a combination of conduct and concealment or conduct and words. Accordingly, we reject MBUSA's argument that the charge required evidence that each defendant affirmatively communicated something false to Carduco.

The jury answered "Yes" as to all defendants.

The jury answered "Yes" as to all defendants.

We note that in its reply to Carduco's brief MBUSA cites secondary sources as supporting its argument. However, we are not persuaded by these secondary sources.

Regarding MBUSA's argument that Casteel applies because the nondisclosure theory is invalid because none of the defendant's owed a duty to disclose, we have already concluded that duty existed.

Specifically, MBUSA complains that there is no evidence that it, "Holt, Dearing, or Oswald (much less all five) made any (much less all five) of the types of affirmative 'misrepresentations' listed in question one and five." However, again, MBUSA cites no authority, and we find none, supporting a conclusion that this complaint constitutes a Casteel problem.

MBUSA attempts to shift the appellate burden to Carduco by arguing that Carduco failed to show to the trial court that it was entitled to a spoliation instruction. However, this Court is not required to scour the record to prove that the trial court was right. It is MBUSA's burden to prove by analysis of the evidence that the trial court was wrong. Nonetheless, we have included some of the evidence that support's the trial court's inclusion of a spoliation instruction in the charge for purposes of our analysis. In its brief, MBUSA has not addressed much of the evidence presented to the trial court regarding spoliation and focuses instead on what it claims was missing.

An instruction for negligent spoliation is appropriate only "on rare occasions" when the negligent destruction of evidence "irreparably prevents the nonspoliating party from having any meaningful opportunity to present a claim or defense." Brookshire Bros., Ltd. v. Aldridge, 438 S.W.3d 9, 25 (Tex.2014).

MBUSA also argues that Carduco's ability to present its case was not prejudiced by any spoliation.

We note that the trial court did not have the benefit of Brookshire Brothers because that case had not been decided at the time of trial. Nevertheless, we will review the entire record to determine if it supports an implied finding on each of the requirements laid out by the Brookshire Brothers Court to submit a spoliation instruction. See Am. Flood Research, Inc. v. Jones, 192 S.W.3d 581, 583 (Tex.2006) (per curiam) (observing that appellate courts review the entire record to determine if the trial court abused its discretion in imposing a discovery sanction).

Kelly's videotaped deposition was played for the trial judge at the hearing on Carduco's request for a spoliation instruction.

Prior to this hearing, at trial, evidence was presented that Matura was present at the meeting where a committee discussed the plan to "work around" the buy/sell agreement.

We note that Carduco presented more evidence to support it spoliation instruction request; however, given that we have concluded that the above-cited evidence is enough to support the trial court's findings, we need not summarize that evidence here.See Tex. R. App. P. 47.4.

We have found no error; thus, we overrule MBUSA's sixth issue complaining that due to cumulative error, reversal is required.

We also overrule MBUSA's eighth issue contending that the evidence is factually insufficient because MBUSA has not explained how the evidence is so contrary to the overwhelming weight of the legally sufficient evidence as to make the verdict clearly wrong and unjust. See Golden Eagle Archery, Inc., 116 S.W.3d at 761. And, "when reversing a trial court's judgment for factual insufficiency, [we] must detail all the evidence relevant to the issue and clearly state why the jury's finding is factually insufficient or so against the great weight and preponderance of the evidence that it is manifestly unjust[, and] [t]he court of appeals must explain how the contrary evidence greatly outweighs the evidence supporting the verdict." Maritime Overseas Corp., 971 S.W.2d at 407. However, without guidance from MBUSA, we decline to independently scour the record to make such finding. See Swinnea v. ERI Consulting Engineers, Inc., 364 S.W.3d 421, 423 (Tex.App.-Tyler 2012, pet. denied) ("Rule 38 requires a party to provide us with such discussion of the facts and the authorities relied upon as may be necessary to present the issue.").

I note that the complained-of non-disclosures are merely the converse of the alleged misrepresentations-both of which involve exclusivity and relocation.

I would not address the remaining issues as the disposition of appellant's first issue would be dispositive of this appeal. See Tex. R. App. P. 47.1.